UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN WILSON,

Plaintiff,

-v-

FEDERAL BUREAU OF INVESTIGATION,

Defendant.

20 Civ. 10324 (LAK) (SDA)

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

AUDREY STRAUSS
United States Attorney
Southern District of New York
Counsel for Defendant
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2799
alexander.hogan@usdoj.gov

Of Counsel:

ALEXANDER J. HOGAN
Assistant United States Attorney

## TABLE OF CONTENTS


BACKGROUND ..........1

ARGUMENT ..........3

I. Standard of Review ..........3

II. Standard as to Adequacy of the Search ..........4

III. Explanation of the FBI's Record System ..........5

A. Central Records System ..........6

B. The CRS General Indices and Indexing ..........7

C. Automated Case Support System ..........7

D. ACS and Sentinel ..........8

E. Electronic Surveillance Indices ..........10

IV. Search Procedures ..........10

V. Searches for Records Responsive to Plaintiff's Requests ..........11

A. First Request ..........11

B. Second Request ..........11

C. Third Request ..........12

VI. The FBI's Search Was Adequate ..........13

CONCLUSION ..........14

## TABLE OF AUTHORITIES

Page(s)

Cases

*Adamowicz v. I.R.S.*,
552 F. Supp. 2d 355 (S.D.N.Y. 2008)........ 5

*Carney v. DOJ*,
19 F.3d 807 (2d Cir. 1994)........ 3, 4, 5

*CIA v. Sims*,
471 U.S. 159 (1985)........ 3

*Dep't of the Interior v. Klamath Water Users Protective Ass'n*,
532 U.S. 1 (2001)........ 3

*Ferguson v. FBI*,
No. 89 Civ. 5071 (RPP), 1995 WL 329307 (S.D.N.Y. June 1, 1995)........ 4

*Garcia v. U.S. Dep't of Justice*,
181 F. Supp. 2d 356 (S.D.N.Y. 2002)........ 5

*Grand Cent. P'ship, Inc. v. Cuomo*,
166 F.3d 473 (2d Cir. 1999)........ 4, 13

*Halpern v. FBI*,
181 F.3d 279 (2d Cir. 1999)........ 4

*Hedrick v. FBI*,
216 F. Supp. 3d 84 (D.D.C. 2016)........ 13

*John Doe Agency v. John Doe Corp.*,
493 U.S. 146 (1989)........ 3

*Judicial Watch, Inc. v. Export-Import Bank*,
108 F. Supp. 2d 19 (D.D.C. 2000)........ 4

*Lardner v. FBI*,
852 F. Supp. 2d 127 (D.D.C. 2012)........ 13

*Long v. Off. of Pers. Mgmt.*,
692 F.3d 185 (2d Cir. 2012)........ 4

*Martin v. DOJ*,
488 F.3d 446 (D.C. Cir. 2007)........ 3

*Maynard v. CIA*,
986 F.2d 547 (1st Cir. 1993) ........ 5

*N.Y. Times Co. v. U.S. Dep't of Justice*,
756 F.3d 100 (2d Cir. 2014) ........ 4, 13

*New York Times Co. v. DOJ*,
872 F. Supp. 2d 309 (S.D.N.Y. 2012) ........ 3, 4

*New York Times Co. v. DOJ*,
915 F. Supp. 2d 508 (S.D.N.Y. 2013) ........ 3

*Smith v. FBI*,
448 F. Supp. 2d 216 (D.D.C. 2006) ........ 13

*Willis v. FBI*,
No. 17-cv-1959 (KBJ), 2019 WL 2138036 (D.D.C. May 16, 2019) ........ 13

*Wilner v. NSA*,
592 F.3d 60 (2d Cir. 2009) ........ 4

Statutes

5 U.S.C. § 552 ........ 1, 3

Rules

Fed. R. Civ. P. 56(a) ........ 4

Defendant the Federal Bureau of Investigation ("FBI"), respectfully submits this memorandum of law in support of its motion for summary judgment in this action brought by Plaintiff John Wilson pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

**BACKGROUND**

On June 14, 2013, Plaintiff submitted a request under the Freedom of Information and Privacy Acts ("FOIPA") to Defendant seeking all records pertaining to himself ("First Request"). Declaration of Michael G. Seidel ("Seidel Decl.") at ¶ 6, Ex. A. Defendant informed Plaintiff that it could not locate responsive records, but noted that an additional search could be conducted if Plaintiff provided additional information about the subject that he believed was of investigative interest to the FBI. *Id*. at ¶ 7, Ex. B.

By letter dated March 26, 2014, Plaintiff submitted a second request seeking agency records "concerning, naming, or relating to" Plaintiff. Cmpl. at ¶ 8 ("Second Request"); *see also* Seidel Decl. at ¶ 8, Ex. C. The Second Request provided the additional information referred to above, including his work history and specific details regarding the subject that he believed was of investigative interest to the FBI. *Id*. The Second Request stated that Plaintiff was a "mining company equity analyst on Wall Street from 1994 to 1998." *See* Dkt. No. 1-1 at 1. "In 1996 . . . [Plaintiff's employer] published one of [his] reports containing information pertaining to an extended shutdown of the NYSE publicly traded U.S. mining company Freeport McMoran owned Grasberg mine in Indonesia." *Id*. at 1-2. "According to press reports at the time and other sources, the company was under investigation . . . following eyewitness allegations it had been involved in the killing of indigenous protestors." *Id*. at 2. Plaintiff claimed that "[f]or the many years following the 1996 publication of information regarding the Freeport McMoran killings, [he has] had contact with multiple individuals who indicated that they were associated with the FBI and

some who made reference to the Freeport McMoran matter." *Id*. On this basis, Plaintiff stated that he believes "it is likely that the Bureau maintains information about [him] stemming from the 1996 report, related and potentially other matters." *Id*. Plaintiff stated that he has "been approached by undercover agents/employees/others that work for or on behalf of the FBI and which include multiple meetings with each during various periods between 1996 and 2010." *Id*. Plaintiff listed, in the Second Request, the names of 16 individuals, some of whom Plaintiff stated are FBI employees. Others on the list, however, Plaintiff did not identify as being associated with the FBI. *Id*. at 2-3.

In response to the Second Request, the FBI conducted a search, reviewed 21 pages of records, and released 10 of those pages either in full or with redactions. Seidel Decl. at ¶ 10, Ex. E. Plaintiff believes that this response was inadequate because the FBI did not locate records with respect to the listed individuals that he allegedly interacted with over the time period described in the Second Request. Cmpl. at ¶¶ 11-12. On November 6, 2014, Plaintiff appealed the FBI's adjudication of the Second Request to the Department of Justice Office of Information Policy ("OIP") and disputed the adequacy of the FBI's search. Seidel Decl. at ¶ 11, Ex. F. OIP sent Plaintiff a letter dated February 23, 2015, affirming the actions taken by the FBI. Seidel Decl. at ¶ 13, Ex. H.

On October 23, 2019, Plaintiff submitted a third FOIA request ("Third Request"). *See* Seidel Decl. at ¶ 14, Ex. I. Again, Plaintiff sought records concerning himself. By letter dated October 29, 2019, the FBI responded by stating that records relating to Plaintiff had already been searched for and released in response to the Second Request, and that an additional search did not yield any further records. *Id*. at ¶ 15; Ex. J. Plaintiff submitted an appeal to OIP on February 17,

2020, again disputing the adequacy of the search. *Id*. at ¶ 16, Ex. K. On March 20, 2020, OIP affirmed the actions taken by the FBI. *Id*. at ¶ 18, Ex. M.

Plaintiff then filed this action on December 8, 2020. Defendant answered the Complaint on March 15, 2021. *See* Dkt. No. 13. On April 26, 2021, the parties informed the Court that Plaintiff intended to challenge the adequacy of the FBI's search and proposed a summary judgment briefing schedule to the Court, which the Court approved on April 27, 2021. *See* Dkt. Nos. 17-18.

## ARGUMENT

### I. Standard of Review

The Freedom of Information Act, 5 U.S.C. § 552, represents a balance struck by Congress "'between the right of the public to know and the need of the Government to keep information in confidence . . . .'" *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (quoting H.R. Rep. 89-1497, 89th Cong., 2d Sess. 6 (1966)); *New York Times Co. v. DOJ*, 872 F. Supp. 2d 309, 314 (S.D.N.Y. 2012). Thus, while FOIA requires disclosure under certain circumstances, the statute recognizes "that public disclosure is not always in the public interest," *CIA v. Sims*, 471 U.S. 159, 166-67 (1985), and mandates that records need not be disclosed if "the documents fall within [the] enumerated exemptions." *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 7 (2001); *see also Martin v. DOJ*, 488 F.3d 446, 453 (D.C. Cir. 2007) ("Recognizing, however, that the public's right to information was not absolute and that disclosure of certain information may harm legitimate governmental or private interests, Congress created several exemptions to FOIA disclosure requirements.") (internal quotations omitted); *John Doe Agency*, 493 U.S. at 152 (FOIA exemptions are "intended to have meaningful reach and application").

Most FOIA actions are resolved by summary judgment. *See, e.g., Carney v. DOJ*, 19 F.3d 807, 812 (2d Cir. 1994); *New York Times Co. v. DOJ*, 915 F. Supp. 2d 508, 531 (S.D.N.Y. 2013).

Summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In FOIA cases, the government meets its burden of demonstrating that it properly withheld documents if it produces declarations "giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden." *Carney*, 19 F.3d at 812. An agency's declarations in support of its withholdings are "accorded a presumption of good faith." *Id.*; *see also Halpern v. FBI*, 181 F.3d 279, 295 (2d Cir. 1999). "[A]n agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Wilner v. NSA*, 592 F.3d 60, 73 (2d Cir. 2009) (citation and internal quotation marks omitted).[1]

**II. Standard as to Adequacy of the Search**

"In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate." *Long v. Off. of Pers. Mgmt.*, 692 F.3d 185, 190 (2d Cir. 2012) (quoting *Carney*, 19 F.3d at 812). A search is judged by the efforts the agency undertook, not by its results. *See Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 489 (2d Cir. 1999). In other words, the agency must simply demonstrate that its search was "reasonably calculated to discover the requested documents." *Id.*; *see also N.Y. Times Co. v. U.S. Dep't of Justice*, 756 F.3d 100, 124 (2d Cir. 2014) ("The adequacy of a search is not measured by its results, but rather by its method."). The search "need not be perfect, but rather need only be reasonable," *Grand Cent. P'ship*, 166 F.3d at 489, because "FOIA was not intended to reduce government agencies to full-time investigators on behalf of requesters." *Judicial Watch, Inc. v.*

[1] Defendant has not submitted a Local Rule 56.1 statement, as "the general rule in this Circuit is that in FOIA actions, agency affidavits alone will support a grant of summary judgment," and a Local Rule 56.1 statement "would be meaningless." *Ferguson v. FBI*, No. 89-cv-5071 (RPP), 1995 WL 329307, at *2 (S.D.N.Y. June 1, 1995), *aff'd*, 83 F.3d 41 (2d Cir. 1996); *New York Times*, 872 F. Supp. 2d at 314 (noting Local Civil Rule 56.1 statement not required in FOIA actions in this Circuit).

*Export-Import Bank*, 108 F. Supp. 2d 19, 27 (D.D.C. 2000) (citation omitted). An agency's search may be reasonable even if it does not return every responsive document. *See Adamowicz v. IRS*, 552 F. Supp. 2d 355, 361 (S.D.N.Y. 2008). "If an agency demonstrates that it has conducted a reasonable search for relevant documents, it has fulfilled its obligations under FOIA and is entitled to summary judgment on this issue." *Garcia v. U.S. Dep't of Justice*, 181 F. Supp. 2d 356, 366 (S.D.N.Y. 2002). An agency may satisfy its burden of demonstrating an adequate search through "[a]ffidavits or declarations supplying facts indicating that the agency has conducted a thorough search." *Carney*, 19 F.3d at 812 (footnote omitted). Such declarations may be made by the individuals supervising each agency's search, rather than by each individual who participated. *Id.* at 814. Where an agency's declaration demonstrates that it has conducted a reasonable search, "the FOIA requester can rebut the agency's affidavit only by showing that the agency's search was not made in good faith." *Maynard v. CIA*, 986 F.2d 547, 560 (1st Cir. 1993); *see also Carney*, 19 F.3d at 812. "[P]urely speculative claims about the existence and discoverability of other documents" are insufficient to overcome the good faith presumption. *Carney*, 19 F.3d at 813. Thus, a court may award summary judgment if the affidavits provided by the agency are "adequate on their face." *Id.* at 812.

## III. Explanation of the FBI's Records System

The systems by which the FBI locates records have changed over time and evolved with the advancement of technology, as discussed herein. In order to support its law enforcement and intelligence gathering functions, the FBI employs an index search methodology to retrieve investigative and other types of records. Specifically, individuals, organizations, events, and other subjects of investigative interest are indexed such that information about them can be easily retrieved in the future. The information below explains the various systems the FBI uses and has

used to locate records in its principal records system, the Central Records System ("CRS"), in response to FOIPA requests.

**A. Central Records System**

In response to FOIPA requests, the FBI conducts a search of the CRS—its principal records system. The CRS is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI in the course of fulfilling its mission and integrated functions as a law enforcement, counterterrorism, and intelligence agency. The CRS spans the entire FBI organization and encompasses the records of FBI Headquarters ("FBIHQ"), FBI field offices, and FBI legal attaché offices ("legats") worldwide. *See* Seidel Decl. at ¶ 21.

The CRS consists of a numerical sequence of files, called FBI "classifications," which are organized according to designated subject categories. The broad array of CRS file classification categories includes types of criminal conduct and investigations conducted by the FBI, as well as categorical subjects pertaining to counterterrorism, intelligence, counterintelligence, personnel, and administrative matters. For identification and retrieval purposes across the FBI, when a case file is opened, it is assigned a universal case file number ("UCFN") consisting of three sequential components: (a) the CRS file classification number, (b) the abbreviation of the FBI office of origin ("OO") initiating the file, and (c) the assigned individual case file number for that particular subject matter.[2] Within each case file, pertinent documents of interest are "serialized," or assigned a document number in the order in which the document is added to the file, typically in chronological

[2] For example, in fictitious file number "11Z-HQ-56789," "11Z" indicates the file classification, "HQ" indicates that FBI Headquarters is the FBI OO of the file, and "56789" is the assigned case specific file number.

order. *Id*. at ¶ 22.

**B. The CRS General Indices and Indexing**

The general indices to the CRS are the index or "key" to locating records within the enormous amount of information contained in the CRS. The CRS is indexed in a manner which meets the FBI's investigative needs and priorities and allows FBI personnel to reasonably and adequately locate pertinent files in the performance of their law enforcement duties. The general indices are arranged in alphabetical order and comprise an index on a variety of subjects to include individuals, organizations, events, and other subjects of investigative interest that are indexed for future retrieval. *See* Seidel Decl. at ¶ 23. The entries fall into two categories:

A: Main entry. A main index entry is created for each individual or non-individual that is the subject or focus of an investigation. Main subjects are identified in the case title of a file.

B. Reference entry. A reference index entry is created for an individual or non-individual associated with an investigation, but who is not the main subject or focus of the investigation. Reference subjects are typically not identified in the case title of a file. *Id.*

FBI employees may index information in the CRS by individual (persons), by organization (entities, places, and things), and/or by event (*e.g.,* a terrorist attack or bank robbery). Indexing information in the CRS is done at the discretion of FBI investigators when information is deemed of sufficient significance to warrant indexing for future retrieval. *Id*. at ¶ 24. Accordingly, the FBI does not index every individual name or other subject in the general indices. *Id*.

**C. Automated Case Support System**

The Automated Case Support system ("ACS") was an electronic, integrated case management system that became effective for FBIHQ and all FBI field offices and legats on October 1, 1995. As part of the ACS implementation process, over 105 million CRS records were

converted from automated systems previously utilized by the FBI into a single, consolidated case management system accessible by all FBI offices. ACS had an operational purpose and design to enable the FBI to locate, retrieve, and maintain information in its files in the performance of its mission and myriad functions. Seidel Decl. at ¶ 25.

The Universal Index ("UNI") was the automated index of the CRS, searchable via ACS. It provided all offices of the FBI with a centralized, electronic means of indexing pertinent investigative information into FBI files for future retrieval via index searching. Individual names were recorded with applicable identifying information, such as date of birth, race, sex, locality, social security number, address, and/or date of an event. ACS implementation built upon and incorporated prior automated FBI indices; therefore, a search employing the UNI application of ACS encompassed data indexed in the automated systems superseded by ACS. As such, a UNI index search in ACS could locate FBI records in both paper and electronic formats created before its 1995 FBI-wide implementation. *Id.* at ¶ 26.

**D. ACS and Sentinel**

Sentinel is the FBI's next generation case management system that became effective FBI-wide on July 1, 2012. Sentinel provides a web-based interface to FBI users and includes the same automated applications that were utilized in ACS. After July 1, 2012, all FBI generated records are created electronically in case files via Sentinel; however, Sentinel did not replace the relevance of ACS as an important FBI search mechanism. Just as pertinent information was indexed into UNI for records generated in ACS before July 1, 2012, when a record is generated in Sentinel, information is indexed for future retrieval. Seidel Decl. at ¶ 27.

On August 1, 2018, ACS was decommissioned and ACS data migrated into Sentinel, including the ACS indices data and digitized investigative records formerly available in ACS.

Sentinel retains the index search methodology and function whereby the CRS is queried, now via Sentinel, for pertinent indexed main and reference entries in case files. All CRS index data from the UNI application previously searched via ACS is now searched through the "ACS Search" function within Sentinel. *Id*. at ¶ 28.

ACS was still operational at the time of Plaintiff's First and Second Requests, but not his Third Request. At the time when ACS was still operational, the FBI's Record/Information Dissemination Section ("RIDS") that handles FOIPA requests would begin its FOIPA searching efforts by conducting an index search via the UNI application in ACS. If records were reasonably expected to have been created on or after July 1, 2012, RIDS would then conduct an index search of Sentinel records to ensure it captured all relevant data indexed after the implementation of Sentinel. Since August 1, 2018, when ACS was decommissioned, upon receipt of a FOIPA request where the subject matter predates the implementation of Sentinel, RIDS generally begins its FOIPA searching efforts by conducting index searches via the "ACS Search" function in Sentinel. RIDS then builds on its ACS index search by conducting an index search of Sentinel records to ensure it captures all relevant data indexed after the implementation of Sentinel. A search of the CRS automated indices, available within Sentinel and via the ACS search function in Sentinel, in most cases, represents the most reasonable means for the FBI to locate records potentially responsive to FOIPA requests. This is because the automated indices provide access to a comprehensive, agency-wide set of indexed data on a wide variety of investigative and administrative subjects. Currently, the automated indices consist of millions of searchable records and are updated daily with material newly indexed in Sentinel. *Id*. at ¶ 29.

In short, the FBI maintains records in the CRS. These records can be searched via an index search methodology. Prior to 2012, this occurred by searching the Universal Index in ACS. After

2012, the same index search methodology is employed, except it is now conducted via Sentinel—the case management system that superseded ACS.

**E. Electronic Surveillance Indices**

The electronic surveillance ("ELSUR") indices comprise records related to electronic surveillance sought, administered, and/or conducted by the FBI. The ELSUR indices include records of: (a) targets of electronic surveillance obtained pursuant to court order, consensual monitoring, or other authority; (b) owners, lessors, or licensors of the premises where the FBI conducted electronic surveillance; (c) and individuals identified as participants of recorded communications. The ELSUR indices is a separate system of records, but this does not mean that the data housed within the ELSUR indices is not also available in the CRS, because targets of electronic surveillance are also indexed in the CRS. Electronic surveillance is an investigative technique pursued in furtherance of FBI investigations and the opening of an investigation (and subsequent indexing of targets of the investigation) would be a prerequisite to the initiation of electronic surveillance. Thus, searches of the CRS, employing the UNI application of ACS or the Sentinel indices and ACS indices available through Sentinel, are reasonably expected to locate records relating to electronic surveillance. Seidel Decl. at ¶ 31.

**IV. Search Procedures**

As explained above, to locate CRS information, the FBI employs an index search methodology. Index searches of the CRS are reasonably expected to locate responsive material within the vast CRS since the FBI indexes pertinent information into the CRS to facilitate retrieval to serve its law enforcement and intelligence gathering functions. Given the broad range of indexed material in terms of both time frame and subject matter that it can locate in FBI files, a search of the automated indices available through Sentinel (including through the ACS search function in Sentinel) is the mechanism the FBI employs to conduct CRS index searches. Seidel

Decl. at ¶ 38.

Also as noted above, the entries in the indices fall into two categories—main entries and reference entries. *See supra* at 7. The FBI's policy is to search for and identify only main files responsive to most FOIPA requests at the administrative stage. *Id*. at ¶ 37. In response to the filing of a complaint, including Plaintiff's Complaint, the FBI generally conducts an additional search of the CRS to locate any "reference" material, including reference files, responsive to a plaintiff's request. *Id*.

**V. Searches for Records Responsive to Plaintiff's Requests**

**A. First Request**

In response to Plaintiff's First Request, RIDS conducted a CRS index search for potentially responsive records employing the UNI application of ACS using the search terms "John C Wilson" and "John Wilson." Seidel Decl. at ¶ 40. As a result of this search effort, RIDS located one reference file. *Id*. However, as noted above, because RIDS's policy, generally, is to identify only main files responsive to a FOIPA request at the administrative stage, because Plaintiff did not ask for reference files in the First Request letter, and because Plaintiff failed to provide information in the First Request letter that could have allowed RIDS to determine that the reference file was responsive, that one identified reference file was not processed. *Id*.

**B. Second Request**

In response to Plaintiff's Second Request, which contained detailed information regarding the subject matter that the Plaintiff believed was of investigative interest to the FBI (*see supra* at 1), RIDS conducted a CRS index search for potentially responsive records employing the UNI application of ACS using the search terms "John Christian Wilson," "John C Wilson," and "John Wilson." Seidel Decl. at ¶ 41. As a result of this search effort, RIDS located one reference file

determined to be responsive to Plaintiff's request.[3] *Id*. RIDS reviewed 21 pages of records and released 10 of those pages either in full or with redactions. *Id*. at ¶ 10.

**C. Third Request**

In response to Plaintiff's Third Request, RIDS conducted a CRS index search for potentially responsive records employing the Sentinel indices and ACS indices available through Sentinel using the search term "John Wilson."[4] Seidel Decl. at ¶ 42. As a result of this search effort, RIDS did not locate any additional records beyond what was identified with respect to the Second Request. *Id*. However, after the filing of the Complaint, due to a change in RIDS's policy as to the review of duplicate pages, the FBI reviewed one additional page of records and released five additional pages as compared to the FBI's response to Plaintiff's Second Request. *See id*. at ¶ 4.

Therefore, in total, the searches the FBI performed in response to the three requests and after the Complaint was filed, identified one reference file resulting in the review of 22 pages of records, of which the FBI released 15 pages in full or in part. *Id*. The reference file located concerned a complaint that Plaintiff had made to the Department of Justice's Office of the Inspector General ("OIG"). *Id*. at ¶ 45. Specifically, Plaintiff complained of alleged misconduct by FBI employees. *See* Dkt. No. 1-3 at 8. The reference file at issue was opened after the OIG forwarded Plaintiff's allegation of misconduct to the FBI's Inspection Division. *See* Seidel Decl.

---

[3] RIDS located the same reference file that was found in the search effort for the First Request. However, this reference file was released at this time because, in the Second Request, Plaintiff asked for the identification of both main and reference files and because Plaintiff provided additional information that allowed RIDS to assess the responsiveness of the reference file. Seidel Decl. at ¶ 41.

[4] An automated search of the Sentinel indices incorporates multiple variations of the search term including: first and last names; first name, middle initial, and last name; and first, middle, and last names, as well as spelling variations. Seidel Decl. at ¶ 42, n.15.

at ¶ 45. Ultimately, the FBI determined that Plaintiff's allegations were not credible and closed the matter. *See* Dkt. No. 1-3 at 2.

**VI. The FBI's Search Was Adequate**

The searches described above were "reasonably calculated to discover the requested documents." *See Grand Cent. P'ship, Inc.*, 166 F.3d at 489; *see also N.Y. Times Co.*, 756 F.3d at 124 ("The adequacy of a search is not measured by its results, but rather by its method."). The FBI identified the system of records reasonably likely to contain responsive records—the Central Records System, and searched the CRS using its index search methodology. The CRS is where the FBI indexes information about individuals, organizations, and other subjects of investigative interest for future retrieval. *See supra* at 6. Given Plaintiff's requests sought information about himself, such information would reasonably be expected to be located in the CRS and discoverable via the index search methodology. Additionally, in this case, any responsive records or information within the ELSUR indices would be duplicative of information located using the ACS indices and the Sentinel indices, *see supra* at 10. Thus, a search of the Sentinel indices and ACS indices available in Sentinel also accomplished the task of locating any responsive records in the ELSUR indices. The adequacy of this search is supported by the fact that the search did, indeed, return results with respect to Plaintiff and the same results were returned each time the search was conducted. Accordingly, the FBI's search was adequate. *See, e.g., Willis v. FBI*, No. 17-cv-1959 (KBJ), 2019 WL 2138036, at *6 (D.D.C. May 16, 2019) (search adequate based upon FBI's search of the CRS); *Hedrick v. FBI*, 216 F. Supp. 3d 84, 93-94 (D.D.C. 2016) ("[T]his Court is persuaded that the FBI's index searches of the CRS using variations of [plaintiff's] name and identifying information about him were reasonably calculated to locate any information indexed to [plaintiff]."); *Lardner v. FBI*, 852 F. Supp. 2d 127, 135 (D.D.C. 2012) (search adequate based upon search of the CRS); *Smith v. FBI*, 448 F. Supp. 2d 216, 221 (D.D.C. 2006) (FBI search

adequate where it used requester's name to search for investigatory files in the CRS).

**CONCLUSION**

For the reasons stated herein, Defendant's motion for summary judgment should be granted in its entirety.

Dated: September 13, 2021
New York, New York

Respectfully submitted,

AUDREY STRAUSS
United States Attorney
Southern District of New York

By: *_/s/ Alexander J. Hogan_*________
ALEXANDER J. HOGAN
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York 10007
Telephone: (212) 637-2799
Facsimile: (212) 637-2686
E-mail: alexander.hogan@usdoj.gov