# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JOHN WILSON,

                         Plaintiff,                    20 Civ. 10324 (LAK) (SDA)

        - against -                          **DECLARATION OF**
                                             **JOHN WILSON**
FEDERAL BUREAU OF INVESTIGATION,             **IN OPPOSITION TO**
                                             **DEFENDANT'S MOTION FOR**
                         Defendant.          **SUMMARY JUDGMENT**

I, John Wilson, do hereby declare under penalties of perjury:

1.      I submit this declaration based on my personal knowledge in support of Plaintiff's

Opposition to Defendant's Motion for Summary Judgment in the above-captioned case.

2.      I am the Plaintiff in this action.

3.      I am a dual Australian and USA citizen.

4.      I currently live in Sydney, Australia and have a small equity research consultancy

business and live with my wife and two young children.

5.      After completing an MBA in 1993 at The Wharton School of the University of

Pennsylvania, I moved to New York City and from late 1993 to June 1999 lived at 170 W 74th

St, Apt 906, New York, NY 10023.

6.      Dialogue reported in this affidavit may be paraphrasing of actual conversation.

7.      For a period of 3 years from late 1994 to late 1997 I dated Susan Holmes, during

which time she disclosed on multiple occasions details of her undercover work for the Federal

Bureau of Investigation ("FBI"). Given the detailed revelations to me of her work for the FBI it

is clear I was not a target of the FBI from the outset of our relationship, something which she

confirmed.

1

8.      From 1994 to 1997 I worked for SG Warburg (and later SBC Warburg) on Wall Street as an equity analyst covering US listed mining companies.

9.      One of the companies I analyzed and published reports on for distribution to fund managers globally was U.S.-based and listed Freeport McMoran. It was, and is, one of the world's largest and most valuable copper companies, worth many tens of billions of dollars, and through its subsidiary Freeport Indonesia controls the Grasberg Mine, one of the largest copper and gold mines in the world, situated in West Papua, Indonesia.

10.     On March 12, 1996, I authored a report (hereinafter the "Report") that flagged concerns about Freeport McMoran, which was under investigation by the United States Department of State following eyewitness reports of human rights abuses against indigenous protestors in the region of its massive Grasberg gold and copper mine in West Papua, Indonesia. The Report is attached hereto as Exhibit 1. The company denied any role in human rights abuses and eyewitness reports were never proven in court.

11.     The Report mentioned the cancellation of the company's OPIC political risk insurance in October 1995 and was critical of the company's approach to resolving civil disputes. It was published and distributed to investors globally by my employer SG Warburg. *See* Exhibit 1 at 1-2.

12.     The 1996 events at the Grasberg mine were of significant interest to the U.S. government, as demonstrated by multiple communications sent from the U.S. embassy in Jakarta to Washington revealed in a document produced by the U.S. State Department in 2014 in response to a separate FOIA request than the one at issue in the instant case. The 2013 FOIA request (F-2013-20605) and an excerpt from the WEP 0002A portion of the subsequent 2016 production concerning the State Department investigation are attached hereto as Exhibit 2.

13.     After the Report was published, I was notably excluded from Freeport McMoran's invitation list for the May 1996 annual analyst briefing in New Orleans, to which was standard for all mining analysts from mainstream banks to be invited, and to which I had been invited in the past. Only with persistent requests to their investor relations person was I added back to the list and invited to New Orleans to participate in their annual Wall Street analyst briefing that May.

14.     Subsequently, I attended the analyst briefing in May 1996 held at Freeport McMoran's headquarters in New Orleans. There, I was threatened after asking Freeport McMoran's Chairman and CEO, Jim Bob Moffett, a question about the State Department's ongoing investigation of the company for alleged human rights abuses. The CEO affirmed that the state department investigation was ongoing and that an interim report had been completed, but appeared flustered by the question and gave a long winded answer during which he became irritated and visibly annoyed.

15.     The person who threatened me (who I subsequently assumed to be a federal agent) addressed me by name and earlier had been sitting among the analysts around the boardroom table during the CEO's presentation and analyst question time. He blended in with the analyst community but I did not recall ever having seen him before. When the analyst briefing ended, I moved out into the alcove that was attached to the boardroom and spoke briefly there with Jim Bob Moffett.

16.     Oddly, this person stood slightly behind flanking me and after I moved away from Jim Bob the person moved with me and said to me, "John, I respect you for asking that question," referring to my question during the briefing. "But you might wish you hadn't."

17.     Ignoring my own surprise that he knew my name, I replied, "So what, what do I care? What can they do to me?"

18.     His response came forth firmly, albeit cryptically, "You might not want to find out." He then moved away.

19.     As described later in this affidavit, in early 1996 Freeport McMoran was under enormous pressure in the face of reports and allegations in the international media of human rights and environmental abuses at the Grasberg Mine in West Papua, the company's embarrassment over the loss of its OPIC political risk insurance in October 1995, and the March 1996 protests over 3 days at its Grasberg Mine. Indonesian President Suharto was furious as events seemed to be spiraling out of control and unhappy with the damaging exposure in the international media. CEO Moffett made an emergency trip to West Papua arriving March 13, 1996, to negotiate with the traditional landowners.

20.     The timing and content of my Report touched a nerve. Following the publication of the Report (on March 12, 1996 the day before CEO Moffett arrived in West Papua) and my question to the CEO, I experienced a campaign of interference and harassment by individuals who identified themselves as working for the FBI that eventually were a factor in my moving away from the United States following intense interference with my employment, social and professional networks, and privacy.

21.     In addition to my own experiences of FBI harassment, upon information and belief, at least seven other professionals who made disclosures in the mid-1990s related to Freeport McMoran, including academic and journalists, have described similar interference, including being threatened, blacklisted, and in other ways intimidated for their work. The

experiences of these other professionals are detailed in Denise Leith's The Politics of Power Freeport in Suharto's Indonesia. The relevant excerpted pages are attached hereto as Exhibit 3.

22.    There are several key indications the FBI holds documents on me, as detailed in this affidavit. These include:

a.    Steve Garber confirmed to me in 2004 that he worked for the FBI and that I have been the subject of an FBI interference campaign on account of my work on Freeport McMoran in 1996;

b.    Susan Holmes, strongly insinuated the same to me in 2003 during an extensive interview she conducted with me at Cafe Fiorello in NYC;

c.    Holmes in 2003 and Garber in June 2004 in separate conversations with me, linked Henry Kissinger, a former board member and advisor to Freeport McMoran, my analyst report from 1996, and insinuated the report embarrassed the company and potentially fuelled shareholder disquiet. I had covered many companies and written many reports during my years as an analyst, but they both raised this one report with me and were intently focused on it. Holmes insinuated I had been set up as an extremist and placed on a watchlist of some kind, in retribution for my work on Freeport McMoran;

d.    During the 2003 NYC interview Holmes had extensive detailed knowledge of some of my private conversations and revealed many details of information she had from many private records of mine spanning several decades including state, school, university and employment records;

e.    Holmes told me in 1999 in NYC that "You would not believe how surprised I was when I saw your name on the work files." Alluding to "work" was a euphemism

for the FBI. In 2003 at Cafe Fiorello she told me that she has photos of me with David Foreman in her "work" files;

f.   In the years subsequent to the 2003 interview with Holmes, agents in Australia and the US revealed to me they had clear and distinct detailed knowledge of things I discussed with her in 2003;

g.   From 2004 to 2020, multiple complaint letters from me, my LA lawyer Barry Fisher, and also my congressional representatives, were sent to a number of U.S. agencies, including DOJ Inspectors General and raising specific questions we were responded to with evasive, incomplete and qualified denials which, for example, deny persons were "employees" of the FBI but not deny they were working in some other capacity, for example, as an independent contractor, for, or providing reports to an agency of the U.S.

**Holmes' descriptions of her FBI undercover work:**

23.    From 1993 to 1997, Susan Holmes made many disclosures to me regarding her work on behalf the FBI.

24.    Shortly after I met Holmes in 1994 we started going out and dated until late 1997. She told me that in addition to her "day" job she had a second career where she worked undercover for the FBI. She made detailed revelations of her work to me with the FBI and assured me I was not a target; I believe I was not a target of any FBI investigation at that time.

25.    Around November 1994, shortly after introducing me to Steve Garber, Holmes showed me her FBI identification card. The card had a black background, was plasticky in appearance, possibly laminated, and was around the size of a credit card. I vaguely recall, with less clarity, it displayed her face and personal identification details. She then told me that she

6

worked for the FBI. She was then around 32 years old and told me she had worked for the FBI since she was 27, including a period where she was posted to Ireland by the FBI. She also informed me that she worked at the FBI along with another individual, known to me as Steve Garber.

26.   A week or two prior to Holmes showing me her FBI identification card, she invited me on a hike with Steve Garber in Harriman State Park. After the hike, Holmes told me the hike had been a chance for Garber to vet me on behalf of the FBI as Holmes's new boyfriend, due to Holmes's recent six-month posting to Ireland with the FBI, and the fact I, a dual US/Australian citizen, was a foreigner.

27.   At that time, Holmes informed me that it was not unusual for the new partner of an individual working on behalf of the FBI to be "checked out".

28.   When I invited Holmes to Australia over the Christmas holiday period in 1994, Holmes told me she was required to get permission from her "work" (a euphemism for the FBI) before she could accept the invitation to travel overseas.

29.   On around ten or more occasions, from 1994 to 1997, Holmes informed me that she worked for the FBI and several times discussed in extensive detail her background with the FBI, including but not limited to her role, training, and past operations. I was present or accompanied her on several FBI related undertakings. Some of these details are described below.

30.   On several occasions, Holmes asked me to accompany her on trips and to social gatherings that she later informed me had been part of her FBI assignments. One involved an unofficial Sierra Club volunteers after work drinks gathering around 1995-6 in a restaurant in NYC with Montanan tree spiking suspect James B. who was subsequently prosecuted, and at which a number of other undercover FBI agents were present.

31.     Holmes showed me her FBI wire device used for covert recording, with two leads, one running over each should and joining at the front. She used this on the above gathering with a suspected tree spiker from Missoula, Montana visiting NYC around 1995-96.

32.     Holmes told me that she had received firearms training from the FBI, that she had an FBI issued handgun that she kept in her apartment, and that she regularly attended FBI training programs at Quantico.

33.     Holmes showed me several T shirts and other clothing items bearing the FBI's initials in large letters at her New York City apartment in and around 1997.

34.     Holmes told me several times between 1994 and 1997 that she focused on eco-extremists for the FBI in the eastern half of the U.S.A. She said she was not directly involved with the western half and its handling of the Unabomber case, a high profile case that had been successfully closed in 1996 with the arrest of Ted Kaczynski in Montana, though on occasion she had discussed the matter in general terms with me or in my presence with others.

35.     During 1994 to 1997 Holmes mentioned at least two of her FBI work targets. One was Dave Foreman, founder of the Wildlands Network and co-founder of Earth First! who is a high-profile environmentalist and author. The other was Paul Winter, who performs the annual winter solstice concert at The Cathedral of St John the Divine in NYC, which we used to attend annually. Holmes said Winter had been a student environmental activist and leader years before at college.

36.     Holmes took me unofficially on an FBI work trip to meet with David Brower - the eminent "Archdruid" of the US environmental movement in the summer of 1997 when we were in Detroit visiting her family and he was visiting nearby. She said the meeting had been arranged

through FBI contacts, to bolster her understanding of the Sierra Club Board  (which she was on) in order to boost her credibility with other board members, including David Foreman.

37.     On a trip to Holmes's family home in Detroit in 1997, Holmes' mother discussed Holmes' role with the FBI with me.

38.     Holmes told me she worked with the FBI undercover notionally on a full-time basis though it was more like a sleeper agent arrangement and she was only occasionally required to do agency work. She said herself and others like Steve Garber were not "employees" nor classified as "Special Agents". Instead her role was akin to an independent contractor and she said a lot of undercover agents work for the FBI by a similar arrangement, the term for which was not generally known to the public.

39.     Holmes attempted to recruit me to the FBI in 1997. She pitched me in my apartment one afternoon and strongly encouraged me to apply saying the FBI was looking to recruit more people who work on Wall Street.

40.     In mid 1996, I watched her use her FBI identification card to gain access past a security point at an Irish folk music concert we were attending in New York City where Holmes' was targeting one of the performers.

41.     When we eventually arrived backstage after a delay, Mary said, "Hi Susan, your cover is blown." She looked at me and back to Susan to see what her response might be. Susan didn't say anything clear, mumbling something like "Oh" under her breath. Mary continued, "Security called down, said there was an FBI agent coming down with a tall blonde guy [alluding to me]". There were only a few people in the room, and we were the only ones to come in recently.

42.     Afterwards, as we walked home, Holmes told me that she and her FBI colleagues spend a lot of time targeting "dissidents" and others to assist the FBI in smearing, marginalizing, and blacklisting them, and turning their personal life upside down to the extent they can.

43.     Holmes mentioned some of her other FBI work assignments as we walked. This included attendance at a party with other young women working on behalf of the FBI on the boat of a well known Saudi Arabian businessman and alleged international arms trader who had been implicated in money laundering and the US Iran-contra scandal.

44.     Holmes detailed specific tactics and told me, in sum and substance, "The FBI tries not to do physical things, not leave a physical trail to get the police and courts involved."

45.     "How do they do that?" I asked. She responded, "They find out who their friends and family members are, where they hang out, what they do, and get them to help; to say and do things to them; to attack them verbally and un-befriend them."

46.     I asked, "Don't people complain?" Holmes said, "Yes, people complain once they realize that the FBI is involved. But a lot of people don't realize, they don't know that something has happened because of the FBI. If they do find out and complain, the FBI delays responding and then misrepresents the complaint they are responding to, when they do eventually respond".

47.     Holmes told me in 1999 that "You would not believe how surprised I was when I saw your name on the work files." Her alluding to "work" was a euphemism for the FBI. We were having dinner at the South Sea Port in mid 1999 in NYC and she added cryptically, "I'm not going to let them do this to you!". This and her statement in 2003 (below) of having photos of me with David Foreman in her "work files" indicates the FBI holds documents and records on me.

**Background to events at US mining company Freeport McMoran's Grasberg Mine, West Papua around March 1996:**

48.     Freeport McMoran's Grasberg Mine in West Papua:  The project area around the Grasberg mine has had a long history of violence following the deposit's discovery in 1988. A massive expansion of Freeport's land holding in the area was granted in 1994 rising from around 6 million acres to 9 million acres without requirement to compensate the traditional owners. Further, the concessions were granted without stringent environmental controls. The ensuing conflict over the years, starting in 1994, and including the 1994 Christmas Day massacre, resulted in the deaths of hundreds of indigenous protestors. The relevant excerpted pages are attached hereto as Exhibit 4. (Denise Leith, 2003 The Politics of Power Freeport in Suharto's Indonesia, University of Hawai'i Press. p64.)

49.     Forced relocations were undertaken by the military reportedly with Freeport's material assistance, and the company, or a subsidiary, also directly funded the Indonesian military and certain Indonesian army officers. To assure continued operations at Grasberg, Freeport built its own private security force, frequently recruiting from US forces, the FBI and CIA. The company has also paid for and provided material support to the Indonesian military and police, to the tune of millions of dollars a year, and offered material support to military operations in West Papua. The NYT also reports estimates that the military had killed 160 people in the area of the mine and surrounds between 1975 and 1997. The relevant excerpted pages are attached hereto as Exhibit 5. (Jane Perlez and Raymond Bonner, December 27, 2005 Below a Mountain of Wealth, a River of Waste, The New York Times.)

50.     It was the Grasberg riots that went from the 10th to the 13th March 1996 that my analyst report of 12 March 1996 commented on, riots that were also commented upon in the

international media, and were closely scrutinized by the US embassy in Jakarta - as was revealed subsequently through an FOIA request (F-2013-20605) I made to the State Department. (US State Department response dated 15 December 2016 to F-2013-20605). In March and April 1996 there were multiple communications sent from the US embassy in Jakarta to Washington as indicated in the FOIA response. It is clear from the cables that the US embassy in Jakarta had a very hands-on role assisting Freeport manage the fallout. Cables from the embassy conveyed details of the gravity of the situation to Washington. The authorities were in no mood for dissent either at home in Washington, or in Indonesia. CEO Moffett made an emergency trip to West Papua arriving March 13, 1996. This was the behind-the-scenes, nonpublic, background to which my analyst report was published 12 March 1996. The relevant excerpted pages are attached hereto as Exhibit 6. (A Wall Street Journal News Roundup, Riots in Indonesia quelled; U.S. mine prepares to reopen, Wall Street Journal, Eastern edition, pA15.)

51.     At the height of the riots Jim Bob Moffett, Freeport's CEO, under pressure from Suharto, made an emergency trip to Indonesia arriving on 13 March to try to resolve the conflict and placate the traditional owners. He met with the traditional owners' representatives and offered them new incentives, including a 1% royalty on sales from Grasberg. He also held meetings with Indonesian military commanders. In the aftermath of the riots 3000 to 4000 additional troops were moved into the area and an Indonesian warship was stationed at the port of Amamapere. The relevant excerpted pages are attached hereto as Exhibit 7. (Denise Leith, 2003 The Politics of Power Freeport in Suharto's Indonesia, University of Hawai'i Press. p203-4.)

**2003 Interview by Holmes on behalf of the U.S. government**

52.     On or around Saturday, May 10th, 2003, Holmes subjected me to a series of intense questioning at Cafe Fiorello, 1900 Broadway in New York City

53.     During the roughly two and a half hours, Holmes acknowledged to me she was undertaking an interview at the behest of a U.S. government agency.

54.     During the interview, Holmes detailed a myriad of specific details of my life spanning many decades, continents, and people.

55.     These details included but were not limited to information regarding: personal conversations with current and former peers and colleagues going back decades; phone calls I had made on my private home phone; minor traffic offenses incurred in Australia; work records from various companies I had worked at over the years; records of school and university grades; records of purchases; records of state tests; medical history; and camping records at US national parks.

56.     During the interview, Holmes also asked a large number of questions about my background, family members, contacts and opinions.

57.     She asked me if I remembered the report on Freeport McMoran I had published about the killings, the threat I received in the boardroom alcove, the state department investigation, and loss of OPEC political risk insurance. "Yes, I remember it," I said having to think for a moment to recall it.

58.     "What did you think would happen when you published the Freeport note?" she asked.

59.     I was surprised she raised the topic, though she had discussed it with me previously and I thought had some personal interest in it. "I thought nothing would happen,

possibly someone might say something, maybe reprimand me. If the world were truly evil, I thought I might lose my job over it," I said.

60.    She looked at me intently. "You did? You thought you might lose your job? Didn't you care? It was a good job, didn't you want to keep it?" she prodded.

61.    "It was fair to raise the Freeport issues - it was a good issue to raise and I thought it was reasonable to do so. Why should indigenous people be killed for their land and nobody say anything? If I lost my job, I thought I could just go find another one," I said.

62.    Holmes insinuated that I had been targeted by the FBI on account of my Freeport McMoran work report and subsequent questions to the company.

63.    Holmes mentioned specific incidents in detail with individuals she alluded to by name or description and events she was aware of between 1994 and 1997 from my work in NY at Warburg and subsequently 1997-1998 at investment bank Dresdner Kleinwort Benson (DKB) in NYC, which she was aware of through her own sources. These included detailed knowledge of private discussions I had with HR, IT and other specific individuals at both firms. She was aware too of private conversations I had had with certain people at work, whom she alluded to by name or description. For example, re my time at DKB she knew details of someone who had gone through my briefcase and retrieved a book around early 1998; details of my discussion with HR in late 1998; details of Stefan H. odd statement to me as we went to a meeting in NYC around 1998; events and attendees of a lunchtime celebration near work in 1998; reactions of my boss to an IT incident on my computer. There were many more such details she raised across Warburg, DKB and likewise when I moved back to Australia in 1999 to work at Multiplex in Sydney. She was inexplicably aware of specific incidents and conversations with specific individuals at Multiplex.

64.     There were lots of little things Holmes knew from my life spanning many decades, including in Australia, USA, and from certain other countries I had travelled which she mentioned and asked me about. Holmes knew and gave the names and/or descriptions of specific people I knew from my past, school peers and friends, university, work colleagues, etc and related incidents. The incidents were trivial in nature, but she had detailed knowledge of them. The information revealed was consistent with someone who had met or spoken with those people she mentioned and suggests the FBI has records or documents on me.

65.     Holmes asked me detailed questions about my efforts to travel to West Papua in the mid 1980s for hiking. This is the region where the Grasberg Mine was subsequently located after discovery in 1988.

66.     Holmes' told me details about a NY undercover attempted drug sting against me around late 1996 as I walked home from work. The person seemed out of place on the street in front of my apartment building, and I asked him what he wanted after he made eye contact with me - thinking he might be a beggar. But he was selling drugs. I had no interest in that sort of thing nor intention of buying anything, but in the interview in 2003 Holmes relayed comments she said were made by the undercover officer about his interaction with me, and she asked me if I hadn't realized he was an undercover officer. It seems I was inexplicably targeted by him, that the dealer was aware of who I was, and that Holmes was subsequently informed of the interaction through her work. This suggests the FBI holds documents on me.

67.     Holmes also inexplicably had knowledge of specific phone calls I had received or made from my home phone a year or two after we had split up. She mentioned 3 in detail, all around 1998 and 1999, not just meta data, date, time, number, owner of the number - but she knew the content of the call as well:

68.     "You received a call from some girl asking you if you wanted to go out on a date. A trader. Who was she, how did you know her and why didn't you want to go out?" Susan asked. I tried to recall the conversation from some years before and then answered.

69.     Holmes then asked, "You made a call enquiring about possibly joining a yoga class. Who was the person you spoke to - did you know them? Why were they so rude?" It's true, the person was surprisingly rude. I didn't know her, I had never spoken to her before. Who knows!? But again, Susan knew the details of the call.

70.     Susan also knew the details of a call I made around June 1999, shortly before I left the US permanently, in the context of "courtesy calls" I made to a few people I didn't know that well but had been loosely associated with to let them know I was leaving. Again, the call had had a distinctive quality, something unexpected, which Susan was aware of and assumed that I would likely remember as she made mention of it.

71.     There were lots of other interferences in my various jobs and personal life. These accounts are included in a transcript of around 200 pages based on my notes and recollections of the 2003 interview with Holmes and other events.

72.     Furthermore, during the interview, Holmes insinuated to me that Garber was responsible for the interference I had faced in my personal and professional life in the years since 1996. Susan knew of these events from her own sources and asked about or mentioned some to me, such as: an email at DKB I received that someone had interfered with; she was aware from her own sources of specific things certain people had said to me and events at work at Warburg, DKB and Multiplex; and she was aware of surveillance I had been under, including distinctive comments about my walk to work one morning at Warburg in NYC around 1996; a meeting in

midtown with a lawyer around 1997; details of an apparent FBI honey trap introduced to me by Steve Garber around 1997-8 while I was at DKB.

73.     Susan knew of several intrusions into my apartment during the day while I was at work around 1997-8, including a quarter someone left in the middle of my wooden lounge floor, a cigarette roach someone left on a saucer in my open kitchen cupboard, small Freeport corporate gifts handed out at briefings like a maglight and other Freeport items stolen from my apartment - but no other items taken, the laptop on my desk moved; and deleted phone messages we left for each other on my home phone and Susan's home phone around the time of our split up in late 1997. (Upon enquiry from me, building management confirmed they had not been in my apartment, nor had any trades people and such like.)

74.     Other examples of interference include: Susan's "accident" in the subway with my laptop around 1998 which I lent her briefly after we broke up. She showed up at my apartment one evening covered in dirt and torn jeans after getting off the subway at 72nd St and falling down the stairs she said. But she was not bruised or hurt in any way and the whole story seemed fake. The screen on the laptop was smashed, it was badly damaged and she requested she keep it. At dinner in 2003, Susan asked again why I hadn't let her keep the broken laptop. Around this time in 1997-8 Steven Garber entered my apartment building unannounced. He had accompanied Susan past the concierge/security then once inside went to the basement while Susan came up to get me and we went out. The light in my apartment which had been off when we went out was on when I got back. The doorman later told me Steve Garber had left the building sometime after we had gone out. When I later asked him, Garber denied he had been in my apartment.

75.     The large amount of detailed private information Holmes had about many facets of my life, and surprisingly well researched questions she asked, suggests the FBI holds documents on me.

76.     By her statements and questions, Holmes insinuated the FBI concocted to paint me as an environmental extremist, or similar, to justify its long term campaign and conceal the connection to my Freeport McMoran work from 1996. If what she indicates is correct, then the FBI has done this intentionally and maliciously to justify interference with me and also to conceal documents from me that I would otherwise be entitled to access under FOIA.

77.     In or around 2002 or 2003, Mark W. a former friend from Sydney, who, upon information and belief, works for an Australian law enforcement or intelligence agency, one day in Sydney told me that he was aware Holmes was in Sydney on a work trip and he asked me if she had made contact with me. Indeed, based on Susan Holmes' insights and statements to me in the 2003 interview, it seemed she had travelled to Australia and met with some of the people she talked about. This is another indication the FBI holds documents on me.

**FBI disclosures that insinuate misleading FBI classification of Wilson; inappropriate use of FBI FOIA exemptions:**

78.     Holmes told me during the interview that FBI controls and punishes people who "step out of line" on Wall Street and asked if I was obedient to authority.

79.     Holmes asked if I had I ever heard any rumors that the FBI attacked people who were in a position to influence opinion and who spoke out against large US corporations or the government in a way that harmed their interests? "Yes", I said. "What do you know about the

FBI's involvement in punishing people who rock the boat, who speak out and embarrassed prominent figures in the public domain? What have you heard?" she asked.

80.     Holmes intimated to me in 2003 that I had been set up as an extremist and placed on an FBI watchlist of some kind, in retribution for my analyst report on Freeport McMoran published in 1996. "Do you think it's possible you're on a watch list?" she asked.

81.     I was invited by Holmes to join her on a large organised environmentalist campaign rafting trip down the Colorado River in July 1997 with journalists, including from Time Magazine, and David Foreman, whose dory I was allocated to in advance by trip organizers.

82.     Holmes said at the interview in 2003 she had photos in her "work files" (a euphemism for the FBI) depicting me in association with David Foreman in the summer of 1997 on the Colorado River but that she had forgotten to bring them for me to dinner that night. She also alluded to photos from a talk by Dave Foreman I attended later in 1997 in NYC, both encounters were by Holmes' invitation to join her as her partner.

83.     Around late 1997, Susan Holmes invited me to hear David Foreman talk in NY after the rafting trip. We went there together and left together, but she said she needed to sit with some other people for "work" reasons in the audience and that I would have to sit on my own, which I did. I vaguely recall someone taking photos of Dave and of the audience.

84.     Holmes took me to two other speaking engagements in NY between 1994 to 1997, including to hear the brother of Nigerian environmental activist and poet Ken Saro-Wiwa talk after his 1995 execution by the government and who had stood in opposition to the massive Shell oil development in the Niger Delta.

85.     I was invited by Holmes to each of the 3 speaking engagements and we attended together. At the time, I asked Holmes how she knew the talks were on and she said it was through her "work" (euphemism for FBI).

86.     At the 2003 dinner at Cafe Fiorello in NY where Holmes covertly interviewed me, she had an intense focus on Dave Foreman, asked me myriad questions about what I knew of him, my opinions of him, and the Colorado rafting trip in 1997 Holmes had invited me on.

87.     In the 2003 interview in NYC, Holmes disavowed many details of her personal life revealed during the time we dated for 3 years between late 1994 and late 1997, including denial that I was her guest at the Foreman lecture and denied that I had gone with her as her her invitation in 1997. Her denial conveys the impression that my attendance at the talk was at my own instigation. In this context, her denials are consistent with the FBI potentially falsely portraying me as associated with a person of interest to them.

88.     Between 1994 and 1997, Susan had once told me in response to a question I asked about her work interest in  Dave Foreman, "The FBI is no longer concerned about Dave Foreman doing anything wrong, but it's the people attracted to him, associated with him, who they have the interest in. The people attracted to him are the people they are interested in." Given her intense and unusual focus on what I thought and knew of Foreman that evening this seemed further reason to think this to be the category they were now trying to put me in.

89.     At the 2003 dinner interview Holmes asked what I know about handling explosives referring to when I worked with explosives used in the mining industry after graduating with a mining engineering degree from the University of Sydney in 1985. Working on mine sites as a mining engineer was the only time I ever worked with explosives. I had not

worked on a mine site as an engineer since 1989, nor ever dealt with explosives in any other capacity.

90.     "Could you still wire up a charge?" Holmes asked for example. "Could you blow up a dam?" "Was that the reason you went on a tour group through Hoover Dam when you were out West? she asked seeming quite serious, referring to one of the multitude of daily tours open to the public which I had gone on one year when I was out West hiking. "Were you scoping the Hoover Dam with the intention of sabotage?!" she demanded to know. I was alarmed by these baseless assertions and loaded questions.

91.     "No. What are you talking about. Why would you ask that?!" I responded, not sure whether to even respond to such nonsense.

92.     She explored myriad events and innocent tourist visits in this absurd way and presented it with a negative connotation.

93.     These questions placed me in fear that Holmes was attempting to create a record casting me, without basis, as a potential ecological extremist. Alarmingly, her questions, implied, without any basis whatsoever I might have an interest in blowing up a dam, or civilian infrastructure. In odd and alarming questions she asked if I had ever planned such an attack on civilian infrastructure.

94.     It seemed I was being painted by the FBI as an environmental extremist or terrorist, at least on paper. That would explain why Susan had lied about so many things that evening in 2003, including her invitation to me to hear Dave Foreman talk, her weird questions about explosives and blowing up civilian infrastructure, and her odd emphasis on photos portraying me in close association with Foreman.

21

95.     I had no other links to "environmental extremists" other than through Holmes' FBI work, nor did I ever have any other contact with any such targets than through Holmes.

96.     If the FBI chose to do so, it could have drawn on my long term association with Susan Holmes and her role policing aspects of the environmental community for the FBI, to falsely portray me as one of her targets - as an "environmental extremist".

97.     Susan Holmes knew me well. We had gone out for three years, and she knew that I would never have anything to do with any of the things she was suggesting.  However, that was not the point. The point seemed to be to record the conversation, a conversation she was leading, and which could, in a different context, be used to misconstrue, or mislead and muddy the waters as part of the FBI sting which could falsely substantiate my false listing as an environmental extremist or similar.

98.     The FBI, it seems from Holmes' statements and questions, was seeking to create a "plausible" alternative to the Freeport issue to substantiate its interference with me and was attempting to portray me as having close personal ties and association with other people the FBI has, or once had, a "genuine" interest in.

99.     Around 1996 I once expressed understanding or empathy for tree spiking, at which time I was evidently caught inadvertently on Holmes' wire which she hadn't told me about at first, but was still recording as we walked home that night from the FBI's sting on Montana activist James B. I didn't know about that sting at the time, but feeling Susan's wire under her shirt as I put my arm around her amorously she told me that it was her recording wire and what that evening with Sierra Club volunteers had really been about from her point of view, as  well as a handful of other FBI present.

100.    While I didn't endorse the illegal act of tree spiking, my comment echoed Susan's comments that tree spiking had been a very successful means of protecting forests, by warning off logging companies.

101.    In 2003, Holmes asked me why I had gone hiking in the Scapegoat Wilderness near Lincoln, Montana in late 1996. Over my work phone at DKB in NY in late 1997, I had reacted to apparent continuing heavy handed surveillance responding to a question from a third party saying sarcastically I went to Lincoln to see where the Unabomber was from. Seeming to confirm that my work phone was recorded, Holmes around 1997 and then again in 2003 subsequently asked me whether this was really the reason I had gone there hiking. I said no it wasn't the reason; that the reason I had gone there was because of an article in the New York Times from that period that quoted an FBI field agent who was involved in the stake out in the mountain forests around Kaczynski's property in the week leading up to his arrest in April 1996. The New York Times reported the agent as saying the area was the most beautiful he had seen in America - magnificent - he had commented on the beauty and mentioned seeing and hearing all kinds of wildlife. Later that year in 1996 when I was deciding on a destination for a hiking trip, I chose the destination based on recall of the agent's comments about the majesty of the surrounds near Lincoln and the beauty of the country.

**Statements from Holmes and Garber that the FBI targeted me:**

102.    Across several conversations, Holmes in 2003 and Garber in 2004 independently discussed the Report with me, spoke about then-CEO of Freeport McMoran Jim Bob Moffett and then-board member and company advisor Henry Kissinger, and strongly insinuated the Report was the cause of interference and disruption to my life.

103.    In or around June 2004, Garber strongly insinuated I had been targeted by the FBI on account of my 1996 analyst report. He revealed he knew many things, from his own sources, about me.

104.    In September 2004, Steve Garber and I again met in NYC at the Blue Water Grill in Union Square. Here, in response to my question, he affirmed that he worked for the FBI, and that I was being targeted as a result of the Report.

105.    I asked him, in sum and substance, "You are doing this for the FBI right? To confirm, I've been targeted by the FBI on account of my Freeport McMoran work - is that right?" After a short pause without a response, I repeated the question. I wanted to hear him reaffirm that it was the FBI that was behind the attack on me, and that their reason was my Freeport work.

106.    Garber nodded and said, in sum and substance, "Yes."

107.    When I asked Garber how often he did this sort of work on behalf of the FBI, Garber said, in sum and substance, "Fortunately not very often," then," But if I was ever called to testify in court about this, I would probably lie."

108.    Holmes and Garber's words and actions suggest to me that a substantive paper trail regarding their investigation of me must exist in the FBI's records.

**Complaints by Wilson since 2004 to DOJ, OIG, FBI met with evasive and limited denials**

109.    The DOJ/OIG/FBI have never investigated the substance of my complaint concerning FBI misconduct which I reported to them repeatedly over the years since 2004 to 2020. They have made only qualified denials based on a partial assessment and at no point have they provided a complete and unqualified response.

110.    Following Garber's confirmation to me in 2004 that I had faced long term interference from the FBI after publication of my work report on Freeport March 12, 1996 I made persistent and multiple requests for information to various agencies from 2004 to 2020. Over the years since 2004 I have applied under FOIA to the DOJ/FBI; and I, or my LA attorney, Barry Fisher, have sent complaint letters to the DOJ, OIG and FBI, to my NY representatives - Senator Schumer and Congressman Nadler, and the House Judiciary Committee among others. The most recent letter sent to the DOJ/OIG/FBI is dated June 5, 2020 by Barry Fisher to which there has been no substantive response (Attached hereto as Exhibit 8).

111.    The DOJ/FBI/OIG have repeatedly mischaracterized and then denied Holmes, Garber or others named are "employees" or "Special Agents" of the FBI, but not whether they worked in some other capacity for the FBI.

112.    The DOJ's repeated misrepresentation of Holmes, Garber, etc as "employees" or "special Agents", and refusal to engage with the full complaint and make unqualified denials is consistent with the tactics described by Holmes to me in 2006 in which they evade accountability and suggests they are stonewalling me. The motivation apparent in this evasive behavior is an indication the FBI holds documents or records on me.

113.    Around 2012-13 I had three one-hour meetings with Philip Ruddock, the former Australian Attorney General (from October 2003 to December 2007) in his electoral office on the topic of FBI, and Australian partnering agencies, interference with me on account of my Freeport McMoran work in 1996. During these meetings I named several Australian operatives who had interfered with me. Some of these agents in Sydney have at various times from around 2005 indicated specific knowledge with clear and distinct details from the 2003 interview by

Holmes, with multiple instances of such detailed knowledge. Their knowledge is a further indication the FBI holds documents or records on me.

114. Annexed hereto are true and accurate copies of the following exhibits:

a. <u>Exhibit 1</u>: John Wilson's March 12, 1996 Report on Freeport McMoran

b. <u>Exhibit 2</u>: State Department response December 15, 2016 to John Wilson's FOIA request December 11, 2013 (F-2013-20605); p5-6.

c. <u>Exhibit 3</u>: Denise Leith, 2003 *The Politics of Power Freeport in Suharto's Indonesia*. University of Hawai'i Press. p7 footnote 10, p262.

d. <u>Exhibit 4</u>: Denise Leith, 2003 The Politics of Power Freeport in Suharto's Indonesia, University of Hawai'i Press. p64.

e. <u>Exhibit 5</u>: Jane Perlez and Raymond Bonner, December 27, 2005 Below a Mountain of Wealth, a River of Waste, The New York Times.

f. <u>Exhibit 6</u>: A Wall Street Journal News Roundup, Riots in Indonesia quelled; U.S. mine prepares to reopen, Wall Street Journal, Eastern edition, pA15.

g. <u>Exhibit 7</u>: Denise Leith, 2003 The Politics of Power Freeport in Suharto's Indonesia, University of Hawai'i Press. p203-4.

h. <u>Exhibit 8</u>: Letter from Barry Fisher June 5, 2020 to FBI and others.

Dated:       November 16, 2021
             Sydney, Australia

Respectfully submitted,

By: _____
    John Wilson

Sworn to before me this
16th day of November, 2021

W E Kable
_____

Notary Public

WILLIAM EDGAR KABLE
NOTARY PUBLIC
N.S.W. AUSTRALIA



27

This is the Annexure ~~masked~~ referred
to in the ~~declaration~~ / affidavit of
*JOHN WILSON* a
declared / ~~sworn~~ before me on the *16* day
of *NOVEMBER* 20 *21*



William Edgar Kable
Notary Public
New South Wales Australia

# EXHIBIT 1

**FCX: Grasberg Closure Highlights Political Risks**
S.G. Warburg & Co. Inc.--RESEARCH NOTES

| Subject: | Freeport McMoRan Copper and Gold (FCX--$29)--NYSE | | | | | | | OPINION |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Current: | ADD |
| Analyst: | John Wilson, | | | | | | Prior: | ADD |
| Date: | March 12, 1996 | | | | | | Target Price: | 32 |

| | Earnings per Share | | | Cal. P/E 1996E | LT Growth Rate | Yield | Shares O/S (Mil.) | 52-Week Range |
|---|---|---|---|---|---|---|---|---|
| | 12/94 | 12/95A | 12/96E | | | | | |
| NEW | $0.31 | $0.98 | $1.77 | 16.4X | 25% | 3.0% | 203 | $20-30 |

| | Q1/Mar | Q2/Jun | Q3/Sep | Q4/Dec | Total |
|---|---|---|---|---|---|
| 1994 | 0.07 | 0.05 | 0.07 | 0.12 | 0.31 |
| 1995A | 0.21 | 0.22 | 0.30 | 0.27 | 0.98 |
| 1996E | 0.33 | 0.52 | 0.45 | 0.48 | 1.77 |
| 1997E | | | | | 0.85 |

o   **Riots at Grasberg force closure of mine and mill**

o   **Increased military presence highlights potential for escalation of the conflict mid term**

o   **Recommendation under review**

**Grasberg closure expected to be temporary**

Following the reported death (though it is unclear if anyone actually died) of a Dani native on Freeport property last Sunday, Dani villagers rioted forcing the closure of the Freeport mine and mill. After talking with the company, it appears the situation is under control, and currently the expectation is that operations will resume later this week. The military presence in the area has been increased and will remain at higher levels in an attempt to underwrite security. At this stage, we do not anticipate there will be a significant impact to earnings.

**Incident points to increased political risk**

Our view is that increased military presence poses potential for escalation of the violence in the mid term, heightening the political risk of Freeport's investment in Irian Jaya. Ultimately, Freeport needs to deal with the civil aspects of this situation to allay investors concerns, and possibly also those of the US Department of State. The timing is unfortunate for Freeport as it coincides with the arbitration over whether $100 million in OPIC political risk insurance should be rescinded. The company has increasingly come under scrutiny following reported human

rights abuses in the area of the mine and also concerns over its
environmental record.   The latter was cited by OPIC last November as the
basis for withdrawing the $100 million in insurance.

## Recommendation under review

Given the declining outlook for copper prices and the increased risk of
political unrest at Grasberg, our ADD recommendation is under review.

================================================================================
A version of this note has been prepared for First Call.

S. G. WARBURG & CO. INC. A MEMBER OF THE NEW YORK STOCK EXCHANGE, NASD AND
OTHER PRINCIPAL U.S. EXCHANGES.   The information herein has been obtained
from, and any opinions herein are based upon sources believed reliable, but
we do not represent that it is accurate or complete and it should not be
relied upon as such. All opinions and estimates herein reflect our judgment
on the date of this report and are subject to change without notice. This
report is not intended to be an offer, or the solicitation of any offer, to
buy or sell the securities referred to herein. From time to time, this firm
or its affiliates or the principals or employees of this firm or its
affiliates may have a position in the securities referred to herein or hold
options, warrants or rights with respect thereto or other securities of
such issuers and may make a market or otherwise act as principal in
transactions in any of these securities. Any such non-U.S. persons may have
purchased securities referred to herein for their own account in advance of
release of this report. Further information on the securities referred to
herein may be obtained upon request.

# EXHIBIT 2



**United States Department of State**

*Washington, D.C. 20520*

DEC 1 5 2016

Case No. F-2013-20605
Segment:  WEP-0002A

Mr. John █ Wilson

███████████

Australia

Dear Mr. Wilson:

A Department of State Appeals Review Panel, whose members are
listed in an enclosure to this letter, has considered your appeal of
February 26, 2015, for the release of two documents withheld in full and 10
withheld in part by the Department in the course of responding to your
request under the Freedom of Information Act.

The Panel has carefully considered the grounds on which you based your
appeal.  It has decided to release in their entirety six documents initially
withheld in full or in part.  The released material is enclosed.

The Panel has determined that the previously withheld portions of five
documents must continue to be withheld.  One document must continue to be
withheld in its entirety.

The information in one document withheld in full and in the deleted portions
of three documents released in part is properly classified in accordance with
Executive Order 13526 (National Security Information) despite the passage of
time.  Its release reasonably could be expected to cause damage to the
national security of the United States.  It is therefore exempt from disclosure
under subsection (b)(1) of the Freedom of Information Act, 5 USC Section
552(b)(1).

The information in the deleted portions of two documents is of such a nature
that its release would constitute a clearly unwarranted invasion of personal

- 2 -

privacy.  It is therefore exempt from disclosure under subsection (b)(6) of the Freedom of Information Act, 5 USC Section 552(b)(6).

In the case of a document released in part, all non-exempt material that is reasonably segregable from the exempt material has been released.

In your request letter of December 11, 2013, you ask for information concerning a State Department investigation into the activities of Freeport McMoran Copper and Gold and its subsidiary PT Freeport Indonesia in Indonesia.  We have searched the State Department Archive System and can find no record of such an investigation.

The Panel's decision represents the final decision of the Department of State. If you wish to seek judicial review of this determination, you may do so under 5 USC Section 552(a)(4).

Sincerely,

Chairman, Appeals Review Panel

Enclosures:
  List of Panel Members
  Six documents



# DEPARTMENT OF STATE

## APPEALS REVIEW PANEL MEMBERS

**Case Control No.: F-2013-20605, WEP-0002A**

**Chairman:**

Ambassador Francis Terry McNamara

**Members:**

Ambassador James F. Mack

Ambassador William Ryerson

UNCLASSIFIED  U.S. Department of State  Case No. F-2013-20605  Doc No. C05595956  Date: 09/01/2015

PTQ0053

CONFIDENTIAL   PTQ0053

PAGE 01     JAKART 01928  01 OF 02  141045Z
ACTION EAP-01

INFO  LOG-00  AID-00  AMAD-01  CA-02   CIAE-00  OASY-00  SRPP-00
      DS-00  EB-01  EUR-01  FBIE-00  H-01    TEDE-00  INR-00
      IO-00  L-01    ADS-00  NSAE-00  NSCE-00  OCS-03  OIC-02
      PRS-00  P-00    SCT-00  SP-00   SSO-00  SS-00  STR-00
      TRSE-00  USIE-00  ASDS-01  DSCC-00  PRM-10  PRME-01  DRL-09
      G-00    /034W
          ------------------230F6F  141045Z /38
O 141044Z MAR 96
FM AMEMBASSY JAKARTA
TO SECSTATE WASHDC IMMEDIATE 0637
INFO COMSOCPAC HONOLULU HI IMMEDIATE
USCINCSOC MACDILL AFB FL IMMEDIATE
USCINCPAC HONOLULU HI IMMEDIATE
USMISSION GENEVA
AMEMBASSY CANBERRA
AMEMBASSY PORT MORESBY
AMEMBASSY BONN
AMEMBASSY THE HAGUE
JOINT STAFF WASHDC
SECDEF WASHDC                    APPEALS PANEL ACTION: RELEASED IN FULL
JICPAC HONOLULU HI
AMEMBASSY LONDON
DIA WASHDC
JSOC FT BRAGG NC

C O N F I D E N T I A L SECTION 01 OF 02 JAKARTA 001928


CONFIDENTIAL


CONFIDENTIAL

PAGE 02     JAKART 01928  01 OF 02  141045Z
STATE FOR EAP/PIMBS, DRL/AAA, DS/DSS, DSS/OP/EAP, DSS/ITA, AND
DSS/OP/CC

CINCPAC FOR FPA. AMB. SALMON

E.O. 12958: DECLASSIFY 3/14/2006
TAGS: PHUM, ASEC, CASC, ID

UNCLASSIFIED  U.S. Department of State  Case No. F-2013-20605  Doc No. C05595956  Date: 09/01/2015

UNCLASSIFIED  U.S. Department of State  Case No. F-2013-20605  Doc No. C05595956  Date: 09/01/2015

SUBJECT: TRIBAL VIOLENCE IN IRIAN JAYA: SITREP 4: FREEPORT OPERATIONS RESUME

REF: A) JAKARTA 1903 AND PREVIOUS

1.  (U) CLASSIFIED BY POLITICAL COUNSELOR BARBARA J. SCHRAGE. REASONS: SEC. 1.5 (B) AND (D).

2.  (C) BEGIN SUMMARY: EMBASSY CONSOFF AND ARSO ARE EXPECTED TO ARRIVE IN TIMIKA LATE ON MARCH 14.  THE SITUATION IN THE FREEPORT MINING CONCESSION CONTINUES TO RETURN TO NORMAL.  THE MINE IS OPEN, MOST FREEPORT WORKERS ARE BACK ON THE JOB, AND THERE HAVE BEEN NO FURTHER OUTBREAKS OF VIOLENCE.  ESTIMATES OF THE NUMBERS OF PERSONS INVOLVED IN THE RIOTS HAVE BEEN SCALED BACK.  THERE IS NO NEW INFORMATION ON CASUALTIES OR DAMAGE.  PRESIDENT SOEHARTO IS REPORTEDLY IRATE THAT THE SITUATION GOT OUT OF CONTROL.  FREEPORT SOURCES BELIEVE THERE WILL BE MORE ARRESTS, THAT SENIOR MILITARY FIGURES IN THE AREA WILL BE RELIEVED OF DUTY, AND THAT THERE WILL BE A PERMANENT INCREASE IN TROOP PRESENCE AROUND TIMIKA.  A FREEPORT TEAM INCLUDING CEO MOFFETT IS HEARING THE GRIEVANCES OF TRIBAL REPRESENTATIVES IN TIMIKA. FREEPORT BELIEVES THAT "OUTSIDE ELEMENTS" PLAYED A ROLE IN THE INCIDENTS AND HAS PASSED ITS INFORMATION TO MILITARY INTELLIGENCE (BIA) FOR FURTHER ACTION.  NGOS GENERALLY BLAME THE DISTURBANCES ON UNDERLYING SOCIO-ECONOMIC INEQUITIES THAT THEY ATTRIBUTE TO FREEPORT'S MASSIVE

CONFIDENTIAL

CONFIDENTIAL

PAGE 03     JAKART 01928  01 OF 02  141045Z
PRESENCE.  END SUMMARY.

3.  (SBU)  CONSOFF AND ARSO DEPARTED JAKARTA 0700 LOCAL TIME MARCH 14 VIA THE DAO'S C-12 AIRCRAFT FOR IRIAN JAYA.  ETA TIMIKA IS 1800 MARCH 14.  ALTHOUGH WE UNDERSTAND THE AIRPORT IN TIMIKA IS STILL CLOSED TO NORMAL CIVILIAN TRAFFIC UNTIL AT LEAST MARCH 15, THE EMBASSY ARRANGED WITH THE INDONESIAN MILITARY FOR THE C-12 TO LAND.

4.  (C) THE SITUATION IN TIMIKA AND TEMBAGAPURA REMAINS CALM, WITH NO FURTHER OUTBREAKS OF VIOLENCE REPORTED.  FREEPORT EMPLOYEES HAVE LARGELY RETURNED TO WORK;  THE MINE IS NOW BACK IN OPERATION, ACCORDING TO FREEPORT OFFICIALS.  ACCORDING TO ONE LOCAL NEWSPAPER, A TOTAL OF SEVEN PEOPLE HAVE BEEN ARRESTED AND 50 WORKERS INJURED.  WE HAVE NOT BEEN ABLE TO VERIFY THESE FIGURES; OUR SOURCES HAD NO FURTHER DETAILS OF ARRESTS OR CASUALTIES BEYOND WHAT WAS REPORTED IN REFTEL. THEY DID SAY, HOWEVER, THAT ESTIMATES OF THE NUMBERS OF PERSONS INVOLVED IN THE STRIFE HAD BEEN SCALED DOWN TO NO MORE THAT FIVE TO SIX HUNDRED AT A TIME IN ANY ONE PLACE.

5.  (C) FREEPORT SOURCES TELL US THAT FREEPORT HAS GIVEN A REPORT TO MILITARY INTELLIGENCE (BIA) ON THE RIOTING.  WE UNDERSTAND THAT BIA, IN TURN, BRIEFED PRESIDENT SOEHARTO.  SOEHARTO IS REPORTEDLY

UNCLASSIFIED  U.S. Department of State  Case No. F-2013-20605  Doc No. C05595956  Date: 09/01/2015

UNCLASSIFIED  U.S. Department of State  Case No. F-2013-20605  Doc No. C05595956  Date: 09/01/2015

"EXTREMELY IRATE" THAT THE SITUATION GOT OUT OF CONTROL AND BLAMES MILITARY OFFICIALS WHO HAVE RESPONSIBILITY FOR THE REGION.  FREEPORT BELIEVES THAT THERE WILL BE MORE ARRESTS, THAT SENIOR MILITARY FIGURES IN THE AREA WILL BE RELIEVED OF DUTY, AND THAT THERE WILL BE A PERMANENT INCREASE IN TROOP PRESENCE IN THE AREA.

6. (C) FREEPORT SOURCES SAY THAT DISCUSSIONS ARE IN PROGRESS BETWEEN A FREEPORT TEAM (INCLUDING CEO MOFFETT) AND A NUMBER OF REPRESENTATIVES NOT ONLY OF THE AMUNGME AND KOMORO TRIBES NATIVE TO THE AREA BUT ALSO
~~CONFIDENTIAL~~

~~CONFIDENTIAL~~

PAGE 04     JAKART  01928  01 OF 02  141045Z
OF OUTLYING TRIBES SUCH AS DANI, MONA, AND IKARI.  THEY WERE NOT CERTAIN IF GOI AND ABRI REPRESENTATIVES TOOK PART AND DESCRIBED THE MEETING AS ONE IN WHICH FREEPORT WAS BASICALLY SOLICITING THE TRIBESMENS' DEMANDS.

7. (C) THE MOTIVATION BEHIND THE RIOTING REMAINS MURKY.  FREEPORT OFFICIALS CLAIM THAT "OUTSIDE FORCES" PLAYED A ROLE IN THE INCIDENTS, AND THEY HAVE PASSED INFORMATION IN THEIR POSSESSION TO BIA FOR FURTHER INVESTIGATION.  NGO SOURCES ARE BLAMING THE RECENT RIOTING ON THE SOCIO-ECONOMIC AND POLITICAL SITUATION THAT HAS DEVELOPED SINCE THE ARRIVAL OF FREEPORT IN THE AREA.  A NUMBER OF GROUPS, SUCH AS SOME AMUNGME TRIBAL LEADERS WHO WERE IN JAKARTA LAST WEEK TO LOBBY THE PARLIAMENT AND THE HUMAN RIGHTS COMMISSION, ARE CALLING FOR "THREE-PARTY NEGOTIATIONS" BETWEEN FREEPORT, THE GOI, AND THE CONCERNED TRIBES TO REACH A "COMPREHENSIVE SETTLEMENT."

8. (C) FREEPORT HAS RECEIVED WORD THAT THE SAME NGO GROUP THAT STAGED A SMALL DEMONSTRATION AT ITS JAKARTA OFFICES IN SEPTEMBER AT THE TIME THE NATIONAL HUMAN RIGHTS COMMISSION ISSUED ITS REPORT IS PLANNING A SIMILAR ACTION MARCH 15.  THEY EXPECT THAT THE DEMONSTRATION MAY BE LARGER THAN THE ONE IN SEPTEMBER BECAUSE OF THE HEIGHTENED PUBLICITY AND EMOTIONS RESULTING FROM THE RECENT

~~CONFIDENTIAL~~

UNCLASSIFIED  U.S. Department of State  Case No. F-2013-20605  Doc No. C05595956  Date: 09/01/2015

UNCLASSIFIED  U.S. Department of State  Case No. F-2013-20605  Doc No. C05595956  Date: 09/01/2015

NNNNPTQ0054

~~CONFIDENTIAL~~   PTQ0054

PAGE 01     JAKART 01928 02 OF 02 141045Z
ACTION EAP-01

INFO  LOG-00  AID-00  AMAD-01 CA-02   CIAE-00  OASY-00  SRPP-00
      DS-00   EB-01   EUR-01  FBIE-00 H-01    TEDE-00 INR-00
      IO-00   L-01    ADS-00  NSAE-00 NSCE-00 OCS-03  OIC-02
      PRS-00  P-00    SCT-00  SP-00   SSO-00  SS-00   STR-00
      TRSE-00 USIE-00 ASDS-01 DSCC-00 PRM-10  PRME-01 DRL-09
      G-00    /034W
               ------------------230F72  141045Z /38
O 141044Z MAR 96
FM AMEMBASSY JAKARTA
TO SECSTATE WASHDC IMMEDIATE 0638
INFO COMSOCPAC HONOLULU HI IMMEDIATE
USCINCSOC MACDILL AFB FL IMMEDIATE
USCINCPAC HONOLULU HI IMMEDIATE
USMISSION GENEVA
AMEMBASSY CANBERRA
AMEMBASSY PORT MORESBY
AMEMBASSY BONN
AMEMBASSY THE HAGUE
JOINT STAFF WASHDC
SECDEF WASHDC
JICPAC HONOLULU HI
AMEMBASSY LONDON
DIA WASHDC
JSOC FT BRAGG NC

~~C O N F I D E N T I A L~~ SECTION 02 OF 02 JAKARTA 001928

~~CONFIDENTIAL~~

~~CONFIDENTIAL~~

PAGE 02     JAKART 01928 02 OF 02 141045Z
STATE FOR EAP/PIMBS, DRL/AAA, DS/DSS, DSS/OP/EAP, DSS/ITA, AND
DSS/OP/CC

CINCPAC FOR FPA. AMB. SALMON

UNCLASSIFIED  U.S. Department of State  Case No. F-2013-20605  Doc No. C05595956  Date: 09/01/2015

# EXHIBIT 3

7. Budiawan, "Human Rights Good for Business," *Jakarta Post*, 2 December 1999.

8. Robert W. Cox, "Global Restructuring: Making Sense of the Changing International Political Economy," *Political Economy and the Changing Global Order*, ed. Richard Stubbs and Geoffrey R. D. Underhill (London: Macmillan, 1994).

9. When referring to the rise of political activism in parties such as the PUDI and PRD in the mid-nineties, Ariel Heryanto ("Indonesia," p. 109) identifies this same phenomenon.

10. Freeport threatened to sue journalists Robert Bryce and Daryl Slusher, university professors Steven Feld, Alan Cline, and Robert Boyer, and environmental activists Lori Udall and Bill Bunch unless they ceased making "false and damaging accusations" about the company. Andrew Duff, "Off the Desk," *Austin Chronicle*, 15–21 December 1995.

11. Greg Earl, "Foreign Miners Warned over Environment," *Australian Financial Review*, 7 December 1995.

12. Formed in 1991, the ICME provides a comprehensive list of its membership <http://206.191.21.210/icme/members.htm>.

13. Eyal Press, "Freeport-McMoRan at Home and Abroad," *The Nation* 261.4 (31 July/7 August 1995): 126; "The Feds Undress Jim Bob: Freeport's Motherlode," *Austin Chronicle*, 10 November 1995, pp. 18–22; and Project Underground, *Risky Business: The Grasberg Gold Mine. An Independent Annual Report on P.T. Freeport Indonesia* (Berkeley, Calif.: Project Underground, 1998).

14. Michael Roe, Seattle Mennonite Church, 2001 FCX shareholder proposal (presented at 2001 Freeport-McMoRan annual general meeting).

15. Gavan Breen, *Let Them Be: West Papua Revisited* (Melbourne: Australian West Papuan Association, 1993), p. 3. The Morning Star hung beside the Dutch flag for eight months until the Indonesians took control.

16. Washington found very little reason to support the dying European power in this dispute. Moreover, the wishes of the indigenous people were irrelevant to the Americans given a number of important strategic and economic factors at the time: Washington wanted to protect its strategic interests in the area by checking what it saw as the growing Soviet influence in Indonesia under Sukarno; needed to protect established economic interests in Indonesia; desired Indonesian support to continue feeding the voracious Japanese appetite for oil and natural resources essential for rebuilding; and believed that if it entered the argument on the side of the Dutch a military conflict would be inevitable—a situation it desperately wanted to avoid with its already growing commitment in Vietnam. Finally, in the belief that it was only a matter of time before Jakarta eventually controlled the island, the United States and its compliant Western allies made the Realpolitik choice of supporting Jakarta.

17. For a comprehensive critique of the New York Agreement and United Nations involvement see Paul W. van der Veur, "The United Nations in West Irian," *International Organization* 18.1 (Winter 1964): 53–73; and John Saltford "United Nations Involvement with the Act of Self-Determination in West Irian

18. British Embassy, Jakarta, "Confidential Report by Ian Morgan, 3rd Secretary to the British Embassy in Jakarta on visit to West Jaya and Eastern Indonesia," 23 September–2 October 1968 (London, Public Record Office) FCO 24/444, p. 24.

19. Hans Meijer, interview, Asia/Pacific Program, ABC Radio National (Australia), 17 April 2001. Meijer uncovered Dutch documentation that reputedly debunks the myth that Holland tried to protect Papuan interests. Aware that, given a free and fair vote, the Papuans would choose independence, Dutch officials turned a blind eye to the illegalities of the Act of Free Choice as "it was not in their interests to fight again with Indonesia because of the Papuans."

20. British Embassy, "Confidential Report by Ian Morgan," p. 24.

21. Reverend Origenes Hokujoku, a participant in the Act of Free Choice and at the time chairperson of the Soekarnoputra (Jayapura) City Council, said that the participants were given no choice by the Indonesian military.

> Three weeks before the referendum they [those who would vote] were isolated. Instructors continuously pressured them to vote for integration with Indonesia. The electors were given a piece of paper with exact instructions on what to say. There was no way of withdrawing from this sham. If you did there could be serious repercussions against you or your family. I remember we had a final rehearsal to see if we mastered our speeches. One man resisted. He refused to present the obligatory speech. The next morning his body was found in a gorge. My wife was pregnant at the time. Therefore I was given permission to stay home during the weeks preceding the referendum. General Ali Murtopo, the highest officer in Irian, tried to placate me. He had a box of apples imported from Australia to give to my wife, at that time apples cost 3 guilders a piece. We also received towels and transistor radios. We were taken for trips by helicopter. But other times he mocked me. This land belongs to Indonesia, he said. If you want a Free Papua state, then you should ask your god to create an island in the ocean. "The Day All Papuans Cried," *Algemeen Dagblad* (The Netherlands), 12 December 1998. E-mail "Kabar-Irian: The Day all Papuans cried" from Evelien van der Broek <broek519@wxs.nl> through KABAR-IRIAN <kabar-irian@irja.org>, December 18 1999).

22. "West Papua: Efforts to Marginalize the People," *Pacific News Bulletin* 9.4 (April 1994): 7.

23. One of the two journalists, Hugh Lunn of the *Courier Mail*, described how he and the Dutch journalist were continually followed by Indonesians to limit their contact with the West Papuans. He states that the Act of Free Choice was the "saddest story" he covered in this thirty years of journalism. "West Papua: An Issue for the South Pacific Forum," *Pacific News Bulletin* 7.3 (March 1992): 6.

24. Ibid. Secret documentation released by the Australian government in late 1999 indicates that although aware that the consensus among the West

<div style="margin-left: 1em;">Denise Leith<br>The Politics of Power</div>

# EXHIBIT 4

open pit more than 360 meters deep and two kilometers wide filled with green, copper-impregnated water. During its life it had produced approximately thirty-two million tonnes of copper, gold, and silver and had succeeded in generating on average $300 million of revenue annually for the company. In 1988, about 2.2 kilometers away from Ertsberg, Freeport announced that it had discovered its El Dorado, Grasberg. There had been rumors of the discovery more than a decade before it was announced. Why the company decided to withhold the announcement of the discovery until 1988 is open to conjecture. Jan van Gruisen, who was Forbes Wilson's Dutch geologist friend, had taken out a concession from the Dutch for the area in 1959 in the name of his company, Oost Borneo Maatschappij (OBM); OBM did not have the finances to join in developing Ertsberg, but one of its subsidiaries had retained a 5 percent interest in Freeport Indonesia. It was not until Freeport-McMoRan was able to buy out OBM's interest in Freeport Indonesia that it announced the discovery at Grasberg. Moreover, Freeport did not sign the new contract for Grasberg until the mining laws were amended.[27] The discovery of Grasberg caused Freeport to sign two new contracts with Jakarta in 1991 and 1994; these effectively gave the company exploration rights for approximately nine million acres and the right to mine any discoveries for a further fifty-year period. The 1991 contract superseded the original 1967 contract and covered not only the existing 24,700 acres (Block A) of the original Ertsberg mine but approximately another contiguous 6.5 million acres called Block B, part of which was the new Grasberg site. In 1994 a second contract was signed by a PT Freeport Indonesia subsidiary, PT IRJA Eastern Minerals Corporation, for another 2.6 million acres. This new contract of work encompassed three separate areas of land, which are referred to as the Eastern Mining Block and are next to Freeport's Block A and Block B. These three blocks gave Freeport a total of nine million acres of exploration leases with a guaranteed thirty years of operating and the option of two ten-year extensions. Once again Freeport was not forced to operate under restrictive environmental laws or made to compensate the traditional landowners for loss of land.[28]

The elephant that was Grasberg dwarfed Ertsberg in every respect. Not only was it physically more imposing (standing 4,270 meters above sea level, it was 500 meters higher and 2.5 kilometers in diameter), but Ertsberg's productivity pales into insignificance compared with the riches unearthed at Grasberg. In 1999 alone, Grasberg produced more than double the ore recovered from Ertsberg during its life. What can be considered the Grasberg complex[29] constitutes the world's largest known

deposit of gold (91.4 tonnes of gold compared to its nearest rival, Freegold in South Africa, at 60.44 tonnes).[30] Grasberg also currently holds the world's third-largest open-pit copper reserves (32 million tonnes). At extraction rates of less than 10 cents per pound, it is the lowest-cost copper producer in the world. Estimates of Grasberg's worth continue to increase so that despite all predictions the final worth of the mine is impossible to establish; it is classified as "open at depth," which is a euphemism for a bottomless pit. Grasberg is yielding a greater percentage of gold per tonne the lower the mine goes. While at its peak Ertsberg processed 25,000 tonnes per day (tpd) of ore, Grasberg is currently moving approximately 600,000 tpd of earth and rock while discharging about 230,000 tpd of these into the local river system as tailings.[31] The open-pit Grasberg mine is so large and located at such a high altitude that, except for early morning, the site is continually shrouded in cloud; thus satellite tracking of the gigantic mining trucks, which operate twenty-four hours a day, 365 days a year, allowing Freeport to move more tonnes of earth per day than any other mine in the world, is necessary. On current figures Freeport is expected to earn anything from $40 billion to $80 billion from Grasberg over its projected life of more than forty-five years.[32]

Positioned along the ring of fire, the Freeport mining concessions are in one of the highest potential mineralization zones in the world. And while the worth of Grasberg is impossible to establish, so too is the potential of the Freeport concession. Exploration on more than six thousand sites has identified about seventy potential mining sites with drilling commencing on about ten of these. The most recent Freeport estimates are that the concession, which includes a significant new discovery in the old Ertsberg Block A area called the Ertsberg East Surface (previously referred to as Guru Ridge), will yield 50.9 billion pounds of recoverable copper and 63.7 million ounces of gold. Its proximity to both the surface and already existing mines will mean that this new discovery can be developed in conjunction with existing ore bodies to create yet another massive open-pit/underground complex processing more than five hundred million metric tonnes of ore. Freeport's Moffett realistically believes that the area will eventually produce other Grasbergs, eclipsing the riches of the Panguna, Ok Tedi, Lihir, and Porgera mine in Papua New Guinea. To exploit these minerals Freeport had invested approximately $4.5 billion in West Papua by early 2001.[33] The dollar wealth that is Freeport is, however, only half the story.

Outsiders do not understand the strong emotional attachment that results from working on, and creating, such a mine. This is not to understate or negate the indigenous peoples' attachment to the land, which is



# EXHIBIT 5

**The New York Times**
nytimes.com

A romantic
comedy
for adults

December 27, 2005
The Cost of Gold | The Hidden Payroll

# Below a Mountain of Wealth, a River of Waste

By JANE PERLEZ and RAYMOND BONNER

JAKARTA, Indonesia - The closest most people will ever get to remote Papua, or the operations of Freeport-McMoRan, is a computer tour using Google Earth to swoop down over the rain forests and glacier-capped mountains where the American company mines the world's largest gold reserve.

With a few taps on a keyboard, satellite images quickly reveal the deepening spiral that Freeport has bored out of its Grasberg mine as it pursues a virtually bottomless store of gold hidden inside. They also show a spreading soot-colored bruise of almost a billion tons of mine waste that the New Orleans-based company has dumped directly into a jungle river of what had been one of the world's last untouched landscapes.

What is far harder to discern is the intricate web of political and military ties that have helped shield Freeport from the rising pressures that other gold miners have faced to clean up their practices. Only lightly touched by a scant regulatory regime, and cloaked in the protection of the military, Freeport has managed to maintain a nearly impenetrable redoubt on the easternmost Indonesian province as it taps one of the country's richest assets.

Months of investigation by The New York Times revealed a level of contacts and financial support to the military not fully disclosed by Freeport, despite years of requests by shareholders concerned about potential violations of American laws and the company's relations with a military whose human rights record is so blighted that the United States severed ties for a dozen years until November.

Company records obtained by The Times show that from 1998 through 2004, Freeport gave military and police generals, colonels, majors and captains, and military units, nearly $20 million. Individual commanders received tens of thousands of dollars, in one case up to $150,000, according to the documents. They were provided by an individual close to Freeport and confirmed as authentic by current and former employees.

Freeport said in a written response to The Times that it had "taken appropriate steps" in accordance with American and Indonesian laws to provide a secure working environment for its more than 18,000 employees and contract workers.

"There is no alternative to our reliance on the Indonesian military and police in this regard," the company said. "The need for this security, the support provided for such security, and the procedures governing such support, as well as decisions regarding our relationships with the Indonesian government and its security institutions, are ordinary business activities."

While mining and natural resource companies sometimes contribute to the costs to foreign governments in securing their operations, payments to individual officers raise questions of bribes, said several people interviewed by The Times, including a former Indonesian attorney general, who said it was illegal under Indonesian law for officers to accept direct payments.

The Times's investigation also found that, according to one current and two former company officials who helped set up a covert program, Freeport intercepted e-mail messages to spy on its environmental opponents. Freeport declined to comment.

More than 30 current and former Freeport employees and consultants were interviewed over the past several months for this article. Very few would speak for attribution, saying they feared the company's retribution.

Freeport's support of the military is one measure of its extraordinary working environment. In the 1960's, when Freeport entered Papua, its explorers were among the very first outsiders ever encountered by local tribesmen swathed only in penis gourds and armed with bows and arrows.

Since then, Freeport has built what amounts to an entirely new society and economy, all of its own making. Where nary a road existed, Freeport, with the help of the San Francisco-based construction company Bechtel, built virtually every stitch of infrastructure over impossible terrain in engineering feats that it boasts are unparalleled on the planet.

That history, Papua's extreme remoteness and the company's long ties to the Indonesian government have given Freeport exceptional sway over a 21st-century version of the old company town, built on a scale unique even by the standards of modern mega-mining.

"If any operation like this was put forward now, it wouldn't be allowed," said Witoro Soelarno, a senior investigator at the Department of Energy and Mineral Resources, who has visited the mine many times. "But now the operation exists, and many people depend on it."

For years, to secure Freeport's domain, James R. Moffett, a Louisiana-born geologist who is the company chairman, assiduously courted Indonesia's longtime dictator, President Suharto, and his cronies, having Freeport pay for their vacations and some of their children's college education, and cutting them in on deals that made them rich, current and former employees said.

It was a marriage of mutual convenience. As Freeport prospered into a company with $2.3 billion in revenues, it also became among the biggest - in some years the biggest - source of revenue for the government. It remains so.

Freeport says that it provided Indonesia with $33 billion in direct and indirect benefits from 1992 to 2004, almost 2 percent of the country's gross domestic product. With gold prices hitting a 25-year high of $540 an ounce this month, the company estimates it will pay the government $1 billion this year.

With Suharto's ouster in 1998, after 30 years of unchallenged power, Freeport's special place was left vulnerable. But its importance to Indonesia's treasury and its carefully cultivated cocoon of support have helped secure it against challenges from local people, environmental groups, and even the country's own Environment Ministry.

Letters and other documents provided to The Times by government officials showed that the Environment Ministry repeatedly warned the company since 1997 that Freeport was breaching environmental laws. They also reveal the ministry's deep frustration.

At one point last year, a ministry scientist wrote that the mine's production was so huge, and regulatory tools so weak, that it was like "painting on clouds" to persuade Freeport to comply with the ministry's requests to reduce environmental damage.

That frustration stems from an operation that, by Freeport's own estimates, will generate an estimated six billion tons of waste before it is through - more than twice as much earth as was excavated for the Panama Canal.

Much of that waste has already been dumped in the mountains surrounding the mine or down a system of rivers that descends steeply onto the island's low-lying wetlands, close to Lorentz National Park, a pristine rain forest that has been granted special status by the United Nations.

A multimillion-dollar 2002 study by an American consulting company, Parametrix, paid for by Freeport and its joint venture partner, Rio Tinto, and not previously made public, noted that the rivers upstream and the wetlands inundated with waste were now "unsuitable for aquatic life." The report was made available to The Times by the Environment Ministry.

Freeport says it strives to mitigate the environmental effect of its mine, while also maximizing the benefits to its shareholders. The Times made repeated requests to Freeport and to the Indonesian government to visit the mine and its surrounding area, which requires special permission for journalists. All were turned down.

Freeport refused to make any official available for an interview and would respond to questions only in writing. A cover letter signed by its legal counsel, Stanley S. Arkin, said that Grasberg is a copper mine, with the gold retrieved as a byproduct, and that many journalists had visited the mine before the government tightened its rules in the 1990's. "Freeport has nothing to hide," Mr. Arkin wrote.

Indeed, at Grasberg, Freeport-McMoRan Copper & Gold mines the world's third-largest copper deposit. The mine also has proven reserves of 46 million ounces of gold, according to the company's 2004 annual report. This year, Mining International, a trade journal, called Freeport's gold mine the biggest in the world.

Social Tensions Erupt

Since Suharto's ouster, Freeport employees say, Mr. Moffett's motto has been "no tall trees," a call to keep as low a profile as possible, for a company that operates on an almost unimaginable scale.

But even before then, the new world that Freeport created was growing smaller. By the mid-1990's, with production in full swing, and the expanding impact of Grasberg's operations ever more apparent, Freeport was beset on all sides.

Environmental groups, able to coordinate more effectively with the Internet, made Freeport a target. Local tribes were more and more restless at seeing little benefit for themselves as vast riches were extracted from their lands. And some military commanders in Papua saw Grasberg's increasing value as ripe for the plucking.

To fortify itself, Freeport, working hand in hand with Indonesian military intelligence officers, began monitoring the e-mail messages and telephone conversations of its environmental opponents, said an employee who worked on the program and read the e-mail messages.

The company also set up its own system to intercept e-mail messages, according to former and current employees, by establishing a bogus environmental group of its own, which asked people to register online with a password. As is often the case, many who registered used the same password for their own messages, which then allowed the company to tap in.

Freeport's lawyers were nervous, a person who was at the company at the time said, but decided that nothing prohibited the company legally from reading e-mail messages abroad.

Social tensions around the mine, meanwhile, were fast growing, as was Papua's population. Papua, mostly animist and Christian after long years of missionary work, is distinct in many ways from the rest of Indonesia, the world's largest Muslim country.

Almost from Indonesia's independence, the province had rumblings of a separatist movement. Throughout Indonesia the military, a deeply nationalist institution, finances itself by setting up legal enterprises like shopping centers and hotels, or illicit ones, like logging. In Papua, the Grasberg mine became a chance for the military not only to profit but also to deepen its presence in a province where it had barely a toehold before Freeport arrived.

For many years Freeport maintained its own security force, while the Indonesian military battled a weak, low-level insurgency. But slowly their security needs became entwined.

"Where Freeport really took it on the chin is the military who came in had no vehicles, and they would commandeer a Freeport bus or a Freeport driver," said the Rev. David B. Lowry, an Episcopal minister hired by Mr. Moffett to oversee social programs. "We had no policies at that time."

No investigation directly linked Freeport to human rights violations, but increasingly Papuans associated it with the abuses of Indonesian military units, in some cases using company facilities.

An Australian anthropologist, Chris Ballard, who worked for Freeport, and Abigail Abrash, an American human rights campaigner, estimated that 160 people had been killed by the military between 1975 and 1997 in the mine area and its surroundings.

Finally, in March 1996, long-simmering anger at the company erupted in rioting when anti-mine sentiment among different groups coalesced into what was perhaps the biggest threat to the company to this day.

The mine and its mill were shut down for three days. Rioters destroyed $3 million of equipment and ransacked offices.

The company intercepted e-mail messages that, according to two persons who read them at the time, suggested that certain military units, the community and environmental groups were working together.

One e-mail exchange, between a community leader and the head of an environmental group, was filled with tactical military intelligence, according to a person who read the messages. In another exchange, an environmental leader urged the group's members to pull out because the demonstrations had turned violent.

Freeport told The Times that local leaders later met with company officials and said "they had provoked the disturbances as a means of expressing their aspiration to receive greater benefits from our operations."

In recent interviews, current and former Freeport officials recalled how they were stunned when, among those rioting, they saw men with military haircuts, combat boots and walkie-talkies. They seemed to be directing the rioters, at one point, to a Freeport laboratory, which they ransacked.

It was not long before a worried Mr. Moffett flew out to Indonesia in the company jet.

Freeport refused to comment on the meeting that followed. But a company official who was there recounted that Mr. Moffett met with a group of senior Indonesian military officers at the Sheraton Hotel in the lowland town of Timika, near the mine. The all-powerful Gen. Prabowo Subianto, son-in-law of President Suharto and commander of the Indonesian Special Forces, presided.

"Mr. Moffett, to protect you, to protect your company, you have to help the military here," General Prabowo began, according to the company employee who was present.

Mr. Moffett is said to have replied: "Just tell me what I need to do."

The Cost of Security

Each military service drew up its own wish list, current and former company employees said.

In short order, Freeport spent $35 million on military infrastructure - barracks, headquarters, mess halls, roads - and it also gave the commanders 70 Land Rovers and Land Cruisers, which were replaced every few years. Everybody got something, even the Navy and Air Force.

The company had already hired a former C.I.A. operative, and on his recommendation, it now approached a military attaché at the American Embassy in Jakarta, and persuaded him to join the company, according to former and current employees. Two more former American military officers were hired, and a special department, called the Emergency Planning Operation, was set up to handle the company's new relationship with the Indonesian military.

The new department began making direct monthly payments to Indonesian military commanders, while the Security Risk Management office handled the payments to the police, according to company documents and current and former employees.

"They signed a pact with the devil," said an American who was part of Freeport's security operations at the time, and who agreed with the company's decision.

Freeport gave the military and the police in Papua at least $20 million from 1998 to May 2004, according to company documents. In interviews, current and former employees said that at least an additional $10 million was also paid during those years.

Seven years of accounting records were provided to The Times by an individual close to the company. Additional records for three years were provided by Global Witness, a nongovernment organization, which released a report last July, "Paying for Protection," about Freeport's relations with the Indonesian military.

Diarmid O'Sullivan, who works for Global Witness in London, criticized the payments. It may be necessary for a company to help governments with security, he said, but "they should give the money through the proper channels, in a transparent way."

Freeport told The Times, "Our books and records are transparent and accurately reflect the support that we provide."

That support, the company said in its responses, included "mitigating living costs," as well as "infrastructure, catered food and dining hall costs, housing, fuel, travel, vehicle repairs, allowances to cover incidental and administrative costs, and community assistance programs conducted by the military and police."

The company said all of its expenditures were subject to a budget review process.

The records received by The Times showed payments to individual military officers listed under things like "food cost," "administrative services" and "monthly supplement."

Current and former employees said the accounting categories did not reflect what the money was actually used for, and that it was likely that much of the money went into the officers' pockets. The commanders who received the money did not have to sign receipts, current and former employees said.

Asked if there was a reason Freeport would give money directly to military officers, Father Lowry, who retired in March 2004, but remained a consultant to Freeport until June, said, "I can't think of a good one."

The records show that the largest recipient was the commander of the troops in the Freeport area, Lt. Col. Togap F. Gultom.

During six months in 2001, he was given just under $100,000 for "food costs," according to the company records, and more than $150,000 the following year. Freeport gave at least 10 other commanders a total of more than $350,000 for "food costs" in 2002, according to the records.

Colonel Gultom declined to be interviewed.

Those payments were made to individual officers, current and former employees said, even though since the riots Freeport had allowed soldiers to eat in the company's mess and had trucked food to more distant military kitchens. "Three meals a day, seven days a week," a former official said.

Freeport also gave commanders commercial airplane tickets for themselves and their wives and children. Generals flew first or business class and lower ranking officers flew economy, said Brig. Gen. Ramizan Tarigan, who received $14,000 worth of tickets in 2002 for himself and his family.

General Tarigan, who held a senior police post, said that police officers were allowed to accept airplane tickets because their pay was so low - as a general, his base salary was roughly $400 a month - but that it was in violation of police regulations to receive cash payments.

In April 2002, the company gave the senior commander of forces in Papua, Maj. Gen. Mahidin Simbolon, more than $64,000, for what was described in Freeport's books as "fund for military project plan 2002." Eight months later, in December, he was given more than $67,000 for a "humanitarian civic action project." The payments were first reported by Global Witness.

General Simbolon, who is now inspector general of the Indonesian Army, declined requests to be interviewed.

A former Freeport employee who was involved in making those payments said the company could not be certain how much of the money General Simbolon actually spent on those projects.

Unsolved Killings

By 2003, following the Enron scandal and passage of the Sarbanes-Oxley Act, which imposed more rigid accounting practices on companies, Freeport began making payments to military and police units instead of individual officers, according to records and current and former employees.

The company paid police units in Papua slightly under $1 million in 2003, according to the records, listed under items like "monthly supplement payment," "administrative costs" and "administrative support."

Freeport told The Times that "company policies take into account the potential for human rights abuses in determining what types of assistance to provide."

According to the records received by The Times, the police Mobile Brigade, a paramilitary force often cited by the State Department for its brutality, received more than $200,000 in 2003.

In its 2003 annual human rights report, the State Department said soldiers from the Mobile Brigade "continued to commit numerous serious human rights violations, including extrajudicial killings, torture, rape, and arbitrary detention." It cited no specific incidents from Papua.

There was another reason for extra care by the company.

In August 2002, three teachers employed by Freeport, including two Americans, were killed in an ambush on a company road patrolled by the military that Freeport had paid to protect its employees. Three years later, the F.B.I. is still investigating and the reasons for the killings have not been determined. Freeport said that it could not comment on the investigation.

The United States indicted a Papuan, Anthonius Wamang, in 2004. But it has yet to receive the full cooperation of the military, several American officials said.

Freeport employees and American officials said the killings could have been part of a turf war between the military and the police, each of which wanted access to Freeport payments.

An initial report by the Indonesian police pointed to the Indonesia military, and some Freeport and Bush administration officials have said they suspect some level of military involvement.

The police report suggested that the motivation was that Freeport was threatening to cut its support to soldiers. Soldiers assigned to Papua have "high expectations," the report said, but recently, "their perks, such as vehicles, telephones, etc., were reduced."

Questions of Accountability

Freeport has resisted nearly any detailed disclosure of its payments to the military, saying they are legal and even required under Indonesian law.

Marsillam Simanjuntak, who was minister of justice and later attorney general in one of the first governments after the fall of President Suharto, said it was a violation of Indonesian law for soldiers or police officers to accept payments from a company. "Of course, it's illegal," he said.

But many companies do it, he said. The better question to ask, he said, was, "Is it allowed by the laws of the United States?"

This year, the New York City pension funds submitted a shareholder resolution asking Freeport to review its policy on paying the police and military. They argued that it could violate the Foreign Corrupt Practices Act, which forbids American companies from paying bribes to foreign officials. Freeport opposed the resolution.

In 2002, the funds submitted a similar resolution demanding that Freeport disclose how much it was paying to the military. Freeport kept it off the ballot.

In later filings with the Securities and Exchange Commission, Freeport reported that it had paid the military a total of $4.7 million in 2001, and $5.6 million in 2002. The company did not indicate whether the money was paid into commanders' personal accounts, or what the money was used for.

Freeport, in its responses, said it was complying with the Voluntary Principles on Security and Human Rights, a set of guidelines drawn up by the State Department. They recognize that natural resource companies "may be required or expected to contribute to, or otherwise reimburse, the costs of protecting company facilities."

The principles do not address the question of direct payments to individual officers. Nor do they require companies to account for the payments.

Freeport has also said that the payments were required under its Contract of Work, its basic agreement with the government of Indonesia, first signed in 1967 and updated in 1991.

The company declined to provide a copy of the contracts to The Times. A copy of each was provided by Denise Leith, author of "The Politics of Power: Freeport in Suharto's Indonesia." They contained no language requiring payments to the military.

S. Prakash Sethi, head of the International Center for Corporate Accountability, which recently concluded a report on Freeport's development policies in Papua, said that the company had told him that it made "in-kind" contributions to the military, for housing and food, but that he had not been given access to accounting records.

Any direct payments to military officers would be illegal, said Mr. Sethi, an expert on business ethics and corporate social responsibility and a professor at Baruch College. "It's corruption," he said. "It's bribery."

Mine Waste in the Rivers

All the while Freeport sealed its relations with the military, the country's fledgling environment ministry could do little but watch as waste from the mine piled up.

This year Freeport told the Indonesian government that the waste rock in the highlands, 900 feet deep in places, now covers about three square miles.

Down below, nearly 90 square miles of wetlands, once one of the richest freshwater habitats in the world, are virtually buried in mine waste, called tailings, with levels of copper and sediment so high that almost all fish have disappeared, according to environment ministry documents.

The waste, the consistency and color of wet cement, belts down the rivers, and inundates and smothers all in its path, said Russell Dodt, an Australian civil engineer who managed the waste on the wetlands for 10 years until 2004 for Freeport.

About a third of the waste has moved into the coastal estuary, an essential breeding ground for fish, and much of that "was ripped out to sea by the falling tide that acted like a big vacuum cleaner," he said.

But no government, even in Indonesia's new democratic era, has dared encroach on Freeport's prerogatives. The strongest challenge came in 2000, when a feisty politician, Sonny Keraf, who was sympathetic to the Papuans, was appointed environment minister.

Again, Mr. Moffett flew out to Jakarta.

Mr. Keraf initially refused to see the Freeport boss, but eventually agreed, and on the day kept him waiting for an hour and a half. "He came in so arrogant," Mr. Keraf recalled of the meeting in a recent interview, "sitting with his legs crossed."

Freeport refused to comment on the meeting. The American ambassador to Indonesia at the time, Robert Gelbard, said in an interview: "It was a terrible meeting."

Mr. Keraf said that Mr. Moffett had said that his company had never polluted. "I told him that he should spend the money he spent on paying off people not to talk about the mine to properly dispose of the waste," Mr. Keraf said.

Behind the scenes, Mr. Keraf kept up the pressure, angered that the company was using the rivers, forest and wetlands for its mine waste, a process allowed during the Suharto years.

An internal ministry memorandum from 2000 said the mine waste had killed all life in the rivers, and said that this violated the criminal section of the 1997 environmental law.

In January 2001, Mr. Keraf wrote to the coordinating minister for economic affairs, arguing that Freeport should be forced to pay compensation for the rivers, forests and fish that its operations had destroyed.

Six months later, one of his deputies, Masnellyarti Hilman, wrote to Freeport, saying a special environmental commission had recommended that the company stop using the river as a waste chute, and instead build a system of pipes.

She also told Freeport to build sturdier dam-like walls to replace the less solid levees that it used to contain the waste on the wetlands. That practice has continued.

Freeport says that local and regional governments have approved its waste management plans, and that the central government has approved its environmental impact statement and other monitoring plans.

But in a blistering July 2001 letter, Mr. Keraf took the governor of Papua to task for granting Freeport a permit in 1996 to use the rivers for its waste. The governor, Mr. Keraf said, had no authority to grant permits more lenient than the provisions of national laws.

Despite all these efforts, nothing happened. Mr. Keraf was unable to secure the support of other government agencies or his superiors in the cabinet.

In August 2001, a new government came to power, and a less aggressive minister, Nabiel Makarim, replaced Mr. Keraf. At first, he too, talked publicly of setting stricter limits on Freeport. Soon his efforts petered out.

The Environment Ministry has begun trying to put teeth into its rules where it can. It brought a criminal suit against the world's largest gold company, Newmont Mining Corporation, for alleged pollution, including a charge of not having a permit for disposing of mine waste into the sea. Newmont has fought the charges vigorously.

But in the case of Freeport, the ministry has had no traction. Freeport still does not hold a permit from the national government to dispose of mine waste, as required by the 1999 hazardous waste regulations, according to Rasio Ridho Sani, assistant deputy for toxic waste management at the ministry. Mr. Arkin, Freeport's counsel, said that the company cooperated well with the environment ministry and that Freeport would not otherwise comment.

"Freeport says their waste is not hazardous waste," Mr. Rasio said. "We cannot say it is not hazardous waste." He said his division and Freeport were now in negotiations on how to resolve the permit question.

'A Massive Die-Off'

The environment ministry was not the first to challenge Freeport over how it has disposed of its waste in Papua.

The Overseas Private Investment Corporation, a United States government agency that insures American corporations for political risk in uncertain corners of the world, revoked Freeport's insurance policy in October 1995.

It was a landmark decision, the first time that the agency had cut off insurance to any American company for environmental or human rights concerns.

In doing so, two environmental experts, Harvey Himberg, an official at the agency, and David Nelson, a consultant, after visiting the mine for several days, issued a report critical of Freeport's operations, especially the huge amounts of waste it had sent into rivers, something that would not be allowed in the United States.

The company went to court to block the report from being made public, and only a redacted version was later released. A person who thought it should be made public provided an uncensored copy to The Times.

Freeport says the report reached "inaccurate conclusions." The company says it has considered a full range of alternatives for managing and disposing of its waste, instead of using the river, and settled on the best one.

A storage area would not be large enough and would require a tall dam in a region of heavy rainfalls and earthquakes, it said. A waste pipeline, rather than the river, would be too costly, prone to landslides and floods.

To the American auditors, such arguments were not convincing.

Freeport "characterizes engineered alternatives as having the highest potential for catastrophic failure when the project otherwise takes credit for legendary feats," the audit noted, like the pipelines more than 60 miles long down the mountains to carry fuel and copper and gold slurry.

At the time, the waste was jumping the riverbanks, "resulting in a massive die-off of vegetation," the report said.

The company threatened to take the agency to court over the cancellation of its insurance. After protracted negotiations, the policy was reinstated for a few months, as a face-saving gesture to Mr. Moffett, according to the head of the agency then, Ruth Harkin. It was not renewed.

Today, many of the same problems persist, but on a much larger scale. A perpetual worry is where to put all the mine's waste - accumulating at a rate of some 700,000 tons a day.

The danger is that the waste rock atop the mountain will trickle out acids into the honeycomb of caverns and caves beneath the mine in a wet climate that gets up to 12 feet of rain a year, say environmental experts who have worked at the mine.

Stuart Miller, an Australian geochemist who manages Freeport's waste rock, said at a mining conference in 2003 that the first acid runoffs began in 1993.

The company can curb much of it today, he said, by blending in the mountain's abundant limestone with the potentially acid producing rock, which is also plentiful. Freeport also says that the company collects the acid runoff and neutralizes it.

But before 2004, the report obtained by The Times by Parametrix, the consulting company who did the study for Freeport, said that the mine had "an excess of acid-generating material."

A geologist who worked at the mine, who declined to be identified because of fear of jeopardizing future employment, said acids were already flowing into the groundwater. Bright green-colored springs could be seen spouting several miles away, he said, a tell-tale sign that the acids had leached out copper. "That meant the acid water traveled a long way," he said.

Freeport says that the springs are "located several miles from our operations in the Lorentz World Heritage site and are not associated with our operations."

The geologist agreed that the springs probably were in the Lorentz park, and said this showed that acids and copper from the mine were affecting the park, considered a world treasure for its ecological diversity.

In the lowlands, the levees needed to contain the waste will eventually reach more than 70 feet high in some places, the company says.

Freeport says that the tailings are not toxic and that the river it uses for its waste meets Indonesian and American drinking water standards for dissolved metals. The coastal estuary, it says, is a "functioning ecosystem."

The Parametrix report shows copper levels in surface waters high enough to kill sensitive aquatic life in a short time, said Ann Maest, a geochemist who consults on mining issues. The report showed that nearly half of the sediment samples in parts of the coastal estuary were toxic to the sensitive aquatic organisms at the bottom of the food chain, she said.

The amount of sediment presents another problem. Too many suspended solids in water can smother aquatic life. Indonesian law says they should not exceed 400 milligrams per liter.

Freeport's waste contained 37,500 milligrams as the river entered the lowlands, according to an environment ministry's field report in 2004, and 7,500 milligrams as the river entered the Arafura Sea.

Freeport would not comment on the measurements. The company says it spent $30 million on environmental programs in 2004, and planted 50,000 mangrove seedlings last year as part of its reclamation efforts. It says cash crops can be grown on the waste with the addition of nutrients, and has begun demonstration projects.

An Uneasy Coexistence

If the accumulating waste is the despair of critics, for Freeport it signals expanding production. To keep its mine running, the company has increasingly had to play caretaker for the world that it has created.

After the 1996 riots, Freeport began dedicating 1 percent of revenues annually to a development fund for Papua to pay for schools, medical services, roads - whatever the people wanted.

The company built clinics and two hospitals. Other services include programs to control malaria and AIDS and a "recognition" fund for the Kamoro and Amungme tribes of several million dollars which, among other things, gives them shares in the company as part of a compensation package for the lands Freeport is using.

By the end of 2004, Freeport had spent $152 million on the community development fund, the company said.

Mr. Sethi, of the Center for Corporate Accountability, commended Freeport for commissioning the report on the company's development programs, saying that it was the first mining company to do so.

The report, which was released in October, concluded that the company had successfully introduced a human rights training program for its employees and had doubled the number of Papuan employees by 2001. The company was poised to double the number of Papuans in the work force again by 2006, the audit said.

Still, Thom Beanal, the Amungme tribal leader, says the combined weight of the Indonesian government and Freeport has left his people in bad shape. Yes, he said, the company had provided electricity, schools and hospitals, but the infrastructure was built mainly for the benefit of Freeport.

Mr. Beanal, 57, a vocal supporter of independence for Papua, has fought the company from outside and inside. In 2000, he decided that harmony was the better path, and joined the company's advisory board.

In November, he and other Amungme and Komoro tribesmen met with Mr. Moffett at the Sheraton Hotel in Timika. In an interview in Jakarta not long afterward, Mr. Beanal said he told Mr. Moffett that the flood of money from the community fund was ruining people's lives.

When the company arrived, he noted, there were several hundred people in the lowland village of Timika. Now it is home to more than 100,000 in a Wild West atmosphere of too much alcohol, shootouts between soldiers and the police, AIDS and prostitution, protected by the military.

Still more soldiers are on the way. Having negotiated an end to a separatist insurrection this year in another province, Aceh, the government is redeploying soldiers to Papua in a move to defeat the growing enthusiasm for independence, once and for all, and to watch over the province with the world's biggest gold mine. Freeport says its gold ore has 35 years to go.

Mr. Beanal said he was increasingly impatient with the presence of the soldiers and the mine. "We never feel secure there," he said. "What are they guarding? We don't know. Ask Moffett, it's his company."

Evelyn Rusli contributed reporting for this article.

Copyright 2006The New York Times Company | Home | Privacy Policy | Search | Corrections | XML | Help | Contact Us | Work for Us | Site Map | Back to Top

# EXHIBIT 6





# Report Information from ProQuest

24 March 2013 19:15
State Library of New South Wales

## Table of contents

1. Business and Finance

2. Freeport starts mill after riots

3. Riots in Indonesia quelled; U.S. mine prepares to reopen

4. Business Brief -- FREEPORT-MCMORAN COPPER & GOLD: Indonesian Operations Able To Meet Contract Terms

5. Outside agitators

Document 1 of 5

**Riots in Indonesia quelled; U.S. mine prepares to reopen**

Publication info: Wall Street Journal , Eastern edition [New York, N.Y] 14 Mar 1996: A15.

ProQuest document link

**Abstract:**

The army said it restored order in Timika, a remote Indonesian town were rioting on Mar 10 and Mar 12, 1996 between Irian Jaya tribesmen and non-Irianese shop owners forced the closing of a giant US copper mine. At least three people were killed and dozens injured. The huge mine is 82%-owned by Freeport-McMoRan Copper & Gold Inc of New Orleans, which shut the mine as a precautionary measure.

**Full text:**

JAKARTA, Indonesia -- The army said it restored order in Timika, a remote Indonesian town where rioting Sunday and Tuesday forced the closing of a giant U.S. copper mine. At least three people were killed and dozens injured. Property damage was substantial in the town, though not at the nearby mine, whose closure had driven up copper prices on world markets this week.

Diplomats in Jakarta, Timika residents and local press reports said it was quiet yesterday around Timika and Tembagapura, the town next to the copper and gold mine run by PT Freeport Indonesia in Irian Jaya. In Timika, a town of about 50,000, soldiers patrolled streets while many shops and offices remained closed.

The huge mine is 82%-owned by Freeport-McMoRan Copper & Gold Inc. of New Orleans. After a riot by nearly 200 Irian Jaya tribesmen in Tembagapura on Sunday, Freeport shut the mine as a precautionary measure. Freeport officials said they expected the mine to reopen today. They said there was no damage to the mill or mining operation from the riot.

The extent of property damage in Timika, 40 miles from Tembagapura, wasn't immediately clear. Among the dozens of buildings attacked Tuesday by rioters was the Freeport-built airport. The Associated Press quoted Col. Sutan Iskandar, an armed-forces spokesman, as saying that about 3,000 rioters "practically took over the airport and they damaged some facilities." Aviation officials said the airport will remain closed to commercial traffic until tomorrow.

James Moffett, chairman of Freeport-McMoRan, flew into Timika yesterday. He was expected to meet Indonesian officials and tribal leaders.

Timika residents said the situation remained uneasy. Diplomats and residents said the riot involved fighting between non-Irianese migrants who own shops in the town and Irianese who came into Timika. It wasn't certain what sparked the rioting Sunday and Tuesday. Irianese have been unhappy with Freeport, complaining about loss of traditional lands and not getting jobs at the mine. Freeport has stepped up community education and social programs in recent years.

Through yesterday, reporters haven't been permitted by Indonesian authorities to travel to Timika.

Credit: A Wall Street Journal News Roundup

**Subject:** Shutdowns; Riots; Mining industry

**Location:** Indonesia

**Company:** Freeport-McMoRan Copper & Gold Inc

**Publication title:** Wall Street Journal, Eastern edition

**Pages:** A15

**Publication year:** 1996

**Publication date:** Mar 14, 1996

**Year:** 1996

**Section:** International

**Publisher:** Dow Jones & Company Inc

**Place of publication:** New York, N.Y.

**Country of publication:** United States

**Publication subject:** Business And Economics--Banking And Finance

**ISSN:** 00999660

**Source type:** Newspapers

**Language of publication:** English

**Document type:** News

**Accession number:** 03958325

**ProQuest document ID:** 398633737

**Document URL:** http://search.proquest.com/docview/398633737?accountid=13902

**Copyright:** Copyright Dow Jones & Company Inc Mar 14, 1996

**Last updated:** 2010-06-26

**Database:** ABI/INFORM Global

Document 4 of 5

## Business Brief -- FREEPORT-MCMORAN COPPER & GOLD: Indonesian Operations Able To Meet Contract Terms

**Publication info:** Wall Street Journal , Eastern edition [New York, N.Y] 13 Mar 1996: n/a.

ProQuest document link

**Abstract:**

Freeport-McMoRan Copper & Gold Inc. said its Indonesian operations will still meet contractual obligations despite protests and minor vandalism at its facilities.

**Full text:**

Freeport-McMoRan Copper & Gold Inc. said its Indonesian operations will still meet contractual obligations despite protests and minor vandalism at its facilities. The New Orleans mining concern said its stockpiles of gold, silver and copper concentrates in the port town of Amamapare will be sufficient to meet its needs. Its mine in Tembagapura, which is about 50 miles north of Timika, remains closed following protests this weekend. The protesters, the island's indigenous people, associate the mining operations with alleged human-rights violations by Indonesia's government. Environmentalists also oppose the mine. In composite trading yesterday on the New York Stock Exchange, Freeport shares closed at $29.75, down $1.375, or 4.4%.

**Publication title:** Wall Street Journal, Eastern edition

**Pages:** n/a

**Publication year:** 1996

**Publication date:** Mar 13, 1996

**Year:** 1996

**Publisher:** Dow Jones & Company Inc

**Place of publication:** New York, N.Y.

**Country of publication:** United States

**Publication subject:** Business And Economics--Banking And Finance

**ISSN:** 00999660

**Source type:** Newspapers

**Language of publication:** English

**Document type:** NEWSPAPER

**ProQuest document ID:** 398599229

**Document URL:** http://search.proquest.com/docview/398599229?accountid=13902

**Copyright:** (Copyright (c) 1996, Dow Jones & Company, Inc.)

**Last updated:** 2010-06-26

**Database:** ABI/INFORM Global

Document 5 of 5

## Outside agitators

**Author:** Anonymous

**Publication info:** The Progressive 60. 2 (Feb 1996): 11.

ProQuest document link

**Abstract:**

Freeport-McMoran CEO Jim Bob Moffett counterattacked when environmental and human-rights activists protested his company's operation of a gold mine in Indonesia. He should have kept quiet and kept those profits coming.

**Full text:**

Pity the giant multinational, having to defend little things like human-rights abuses. Take the case of Freeport-McMoran, a New Orleans-based company that runs the world's biggest gold mine in the rain forests of Indonesia. The government of Indonesia is a 10 percent partner in the mine, and that government has perhaps the worst human-rights record of any government in the world.

In 1965, it wiped out hundreds of thousands of political opponents. In 1975, with the approval of Henry Kissinger and Gerald Ford, it invaded East Timor, resulting in the deaths of 200,000 Timorese-- one-third of the population of that fledgling nation. (Kissinger is now on the board of directors of Freeport.)

In recent years, Indonesia has continued its crack-downs both in East Timor and in Indonesia. Even in the area of the Freeport mine, the Indonesian government has been accused of murdering and torturing separatists. And the mine itself is causing environmental damage.

Environmental and human-rights activists have been protesting Freeport's Indonesian connections, even holding a demonstration outside CEO Jim Bob Moffett's house.

Jim Bob didn't take too kindly to that. "Imagine yourself at home--your kids, your neighbors. It was a terrible, terrible, experience," one of his senior vice presidents said.

Poor Jim Bob. He responded by making a half-hour infomercial defending the company's record in Indonesia, and he bought time on local stations to broadcast it, The Wall Street Journal reported. He

also took out a two-page ad in The New York Times, alleging a "smear campaign" by unnamed "foreign interests" funded by the U.S. Agency for International Development.

The cost of this counterattack was just a drop in his bucket, but his friends at The Wall Street Journal think he made a mistake by responding to what it called "a group of postadolescent protesters." Better to have said nothing, and gone on with business as usual, The Journal advised.

That's the credo of the savvy multinational. Just keep quiet, hope the protesters go away, and keep those profits coming. Now if we don't hear from Jim Bob again, we'll know why. You can bet he hasn't pulled out of Indonesia; he's just hired better P.R.

**Subject:** Multinational corporations; Mining; Human rights; Gold; Environmental impact; Demonstrations & protests

**Location:** Indonesia

**People:** Moffett, James R

**Company:** Freeport-McMoRan Copper & Gold Inc

**Publication title:** The Progressive

**Volume:** 60

**Issue:** 2

**Pages:** 11

**Number of pages:** 2

**Publication year:** 1996

**Publication date:** Feb 1996

**Year:** 1996

**Publisher:** Progressive Incorporated

**Place of publication:** Madison

**Country of publication:** United States

**Publication subject:** Political Science

**ISSN:** 00330736

**CODEN:** PRGVB6

**Source type:** Magazines

**Language of publication:** English

**Document type:** Commentary

**Accession number:** 02689375

**ProQuest document ID:** 231942276

**Document URL:** http://search.proquest.com/docview/231942276?accountid=13902

**Copyright:** Copyright Progressive Incorporated Feb 1996

**Last updated:** 2010-06-10

**Database:** ProQuest Political Science; ProQuest Research Library

Contact ProQuest

Copyright © 2012 ProQuest LLC. All rights reserved. - Terms and Conditions

jw sent you the following:

Email 1 of 1





# Report Information from ProQuest
24 March 2013 19:08
State Library of New South Wales

## Table of contents

1. Business and Finance

2. Freeport starts mill after riots

3. Riots in Indonesia quelled; U.S. mine prepares to reopen

4. Business Brief -- FREEPORT-MCMORAN COPPER & GOLD: Indonesian Operations Able To Meet Contract Terms

5. A fire-breather gets scorched: Two newspapers and a mining giant

Document 1 of 5

**Business and Finance**

**Publication info:** Asian Wall Street Journal [Victoria, Hong Kong] 14 Mar 1996: 1.

ProQuest document link

**Abstract:**

CHINA IS OFFERING to cement $4 billion in orders for commercial jets from Boeing and McDonnell Douglas, provided Washington will delay sanctions in an unrelated softwaretrade dispute, according to government and industry officials. U.S. officials, however, say they won't sawp the plane orders for a freeze on sanctions on a long-term basis.

Hong Kong shares plunged 3.3% amid the continuing tension between China and Taiwan and uncertainty about the U.S. market. The Hang Seng Index dropped 352.97 points to 10249.48.

Hong Kong mutual funds saw heavy inflows early this year, fueling the market gains that preceded recent declines. In January, net investment in 578 funds tracked rose to $152.4 million, the biggest one-month investment flow ever.

**Full text:**

CHINA IS OFFERING to cement $4 billion in orders for commercial jets from Boeing and McDonnell Douglas, provided Washington will delay sanctions in an unrelated softwaretrade dispute, according to government and industry officials. U.S. officials, however, say they won't sawp the plane orders for a freeze on sanctions on a long-term basis.

---

Hong Kong shares plunged 3.3% amid the continuing tension between China and Taiwan and uncertainty about the U.S. market. The Hang Seng Index dropped 352.97 points to 10249.48.

Hong Kong mutual funds saw heavy inflows early this year, fueling the market gains that preceded recent declines. In January, net investment in 578 funds tracked rose to $152.4 million, the biggest one-month investment flow ever.

---

U.S. shares fell as trading volume declined, but advancers led decliners at midafternoon in New York amid rising technology stocks.

---

Malaysia is reconsidering the incentives it offers to attract foreign companies to set up wafer plants. The review has temporarily halted a proposed $1.2 billion plant by a Hitachi-Lucky Goldstar joint venture, officials said.

---

Taiwan Semiconductor picked a Camas, Washington site for a $1.2 billion joint-venture U.S. chip plant, in which it will have a majority stake. The Taiwanese company's stock shot up 3.9% on the Taipei bourse.

---

Indonesia restored order in Timika, a remote town near a giant Freeport mine, where rioting Tuesday resulted in three deaths, dozens of injuries and substantial property damage.

---

The dollar eased in midafternoon New York trading, though it seemed to be stabilizing against the mark on news Germany will seek to constrain government spending.

---

U.S. Treasurys rose, having stabilized after experiencing choppiness for most of the session.

---

Sapporo's pretax profit rose 3.4% to $122.5 million on a consolidated basis in 1995, despite a slip in sales, which eased 0.2%. The Tokyo-based brewer predicts group pretax profit will rise 16% this year.

---

Morgan Grenfell advised TVE to reject a takeover offer from the South China Morning Post, questioning the SCMP's ability to manage the company.

---

An Australian court ruled that Mobil can't send takeover documents to holders of Ampolex. The injunction also prevents the U.S. company from acquiring certain convertible notes in the Sydney oil and gas concern.

---

Coca-Cola expects its world-wide volume to grow 7% in the first quarter, compared with a 9% increase a year earlier.

---

Shougang International plans a $55.4 million general offer for shares of Shougang Concord Grand Group after it acquires the 50% stake of Essential Assets it doesn't already own.

---

GT Chile's shareholders faced concerns amid growing confusion over a plan to give them the option to exit the ailing closed-end fund.

**Publication title:** Asian Wall Street Journal

**Pages:** 1

**Number of pages:** 0

**Publication year:** 1996

**Publication date:** Mar 14, 1996

**Year:** 1996

**Column:** Business and Finance

**Section:** What's News

**Publisher:** Dow Jones & Company Inc

**Place of publication:** Victoria, Hong Kong

**Country of publication:** United States

**ISSN:** 03779920

**Source type:** Newspapers

**Language of publication:** English

**Document type:** NEWSPAPER

**ProQuest document ID:** 315628987

**Document URL:** http://search.proquest.com/docview/315628987?accountid=13902

**Copyright:** Copyright Dow Jones & Company Inc Mar 14, 1996

**Last updated:** 2011-11-30

**Database:** ProQuest Asian Business & Reference

Document 2 of 5

## Freeport starts mill after riots

**Publication info:** The Irish Times (1921-Current File) [Dublin, Ireland] 14 Mar 1996: 10.

ProQuest document link

**Abstract:** None available.

**Full text:** Not available.

**Publication title:** The Irish Times (1921-Current File)

**First page:** 10

**Number of pages:** 1

**Publication year:** 1996

**Publication date:** Mar 14, 1996

**Year:** 1996

**Publisher:** The Irish Times Ltd.

**Place of publication:** Dublin, Ireland

**Country of publication:** Ireland

**Publication subject:** General Interest Periodicals--Ireland

**Source type:** Historical Newspapers

**Language of publication:** English

**Document type:** article

**ProQuest document ID:** 525616847

**Document URL:** http://search.proquest.com/docview/525616847?accountid=13902

**Copyright:** Copyright The Irish Times Ltd. Mar 14, 1996

**Last updated:** 2010-07-09

**Database:** ProQuest Historical Newspapers: The Irish Times (1859-2011) and The Weekly Irish Times (1876-1958)

Document 3 of 5

## Riots in Indonesia quelled; U.S. mine prepares to reopen

**Publication info:** Wall Street Journal , Eastern edition [New York, N.Y] 14 Mar 1996: A15.

ProQuest document link

**Abstract:**

The army said it restored order in Timika, a remote Indonesian town were rioting on Mar 10 and Mar 12, 1996 between Irian Jaya tribesmen and non-Irianese shop owners forced the closing of a giant US copper mine. At least three people were killed and dozens injured. The huge mine is 82%-owned by Freeport-McMoRan Copper & Gold Inc of New Orleans, which shut the mine as a precautionary measure.

**Full text:**

JAKARTA, Indonesia -- The army said it restored order in Timika, a remote Indonesian town where rioting Sunday and Tuesday forced the closing of a giant U.S. copper mine. At least three people were killed and dozens injured. Property damage was substantial in the town, though not at the nearby mine, whose closure had driven up copper prices on world markets this week.

Diplomats in Jakarta, Timika residents and local press reports said it was quiet yesterday around Timika and Tembagapura, the town next to the copper and gold mine run by PT Freeport Indonesia in Irian Jaya. In Timika, a town of about 50,000, soldiers patrolled streets while many shops and offices remained closed.

The huge mine is 82%-owned by Freeport-McMoRan Copper & Gold Inc. of New Orleans. After a riot by nearly 200 Irian Jaya tribesmen in Tembagapura on Sunday, Freeport shut the mine as a precautionary measure. Freeport officials said they expected the mine to reopen today. They said there was no damage to the mill or mining operation from the riot.

The extent of property damage in Timika, 40 miles from Tembagapura, wasn't immediately clear. Among the dozens of buildings attacked Tuesday by rioters was the Freeport-built airport. The Associated Press quoted Col. Sutan Iskandar, an armed-forces spokesman, as saying that about 3,000 rioters "practically took over the airport and they damaged some facilities." Aviation officials said the airport will remain closed to commercial traffic until tomorrow.

James Moffett, chairman of Freeport-McMoRan, flew into Timika yesterday. He was expected to meet Indonesian officials and tribal leaders.

Timika residents said the situation remained uneasy. Diplomats and residents said the riot involved fighting between non-Irianese migrants who own shops in the town and Irianese who came into Timika. It wasn't certain what sparked the rioting Sunday and Tuesday. Irianese have been unhappy with Freeport, complaining about loss of traditional lands and not getting jobs at the mine. Freeport has stepped up community education and social programs in recent years.

Through yesterday, reporters haven't been permitted by Indonesian authorities to travel to Timika.

Credit: A Wall Street Journal News Roundup

**Subject:** Shutdowns; Riots; Mining industry

**Location:** Indonesia

**Company:** Freeport-McMoRan Copper & Gold Inc

**Publication title:** Wall Street Journal, Eastern edition

**Pages:** A15

**Publication year:** 1996

**Publication date:** Mar 14, 1996

**Year:** 1996

**Section:** International

**Publisher:** Dow Jones & Company Inc

**Place of publication:** New York, N.Y.

**Country of publication:** United States

**Publication subject:** Business And Economics--Banking And Finance

**ISSN:** 00999660

**Source type:** Newspapers

**Language of publication:** English

**Document type:** News

**Accession number:** 03958325

**ProQuest document ID:** 398633737

**Document URL:** http://search.proquest.com/docview/398633737?accountid=13902

**Copyright:** Copyright Dow Jones & Company Inc Mar 14, 1996

**Last updated:** 2010-06-26

**Database:** ABI/INFORM Global

Document 4 of 5

**Business Brief -- FREEPORT-MCMORAN COPPER & GOLD: Indonesian Operations Able To Meet Contract Terms**

**Publication info:** Wall Street Journal , Eastern edition [New York, N.Y] 13 Mar 1996: n/a.

ProQuest document link

**Abstract:**

Freeport-McMoRan Copper & Gold Inc. said its Indonesian operations will still meet contractual obligations despite protests and minor vandalism at its facilities.

**Full text:**

Freeport-McMoRan Copper & Gold Inc. said its Indonesian operations will still meet contractual obligations despite protests and minor vandalism at its facilities. The New Orleans mining concern said its stockpiles of gold, silver and copper concentrates in the port town of Amamapare will be sufficient to meet its needs. Its mine in Tembagapura, which is about 50 miles north of Timika, remains closed following protests this weekend. The protesters, the island's indigenous people, associate the mining operations with alleged human-rights violations by Indonesia's government. Environmentalists also oppose the mine. In composite trading yesterday on the New York Stock Exchange, Freeport shares closed at $29.75, down $1.375, or 4.4%.

**Publication title:** Wall Street Journal, Eastern edition

**Pages:** n/a

**Publication year:** 1996

**Publication date:** Mar 13, 1996

**Year:** 1996

**Publisher:** Dow Jones & Company Inc

**Place of publication:** New York, N.Y.

**Country of publication:** United States

**Publication subject:** Business And Economics--Banking And Finance

**ISSN:** 00999660

**Source type:** Newspapers

**Language of publication:** English

**Document type:** NEWSPAPER

**ProQuest document ID:** 398599229

**Document URL:** http://search.proquest.com/docview/398599229?accountid=13902

**Copyright:** (Copyright (c) 1996, Dow Jones & Company, Inc.)

**Last updated:** 2010-06-26

**Database:** ABI/INFORM Global

Document 5 of 5

**A fire-breather gets scorched: Two newspapers and a mining giant**

**Author:** Dudley, Steve

**Publication info:** Columbia Journalism Review 34. 6 (Mar/Apr 1996): 10.

ProQuest document link

**Abstract:**

Freeport-McMoRan officials disputed an article in the New Orleans "The Times-Picayune" that said the OPIC canceled an insurance policy for the mining firm bcause of the company's environmental damage to an Indonesian mine.

**Full text:**

two newspapers and a mining giant

At midnight last Halloween, the Overseas Private Investment Corporation (OPIC), a government agency that provides political-risk insurance for American companies operating abroad, canceled the policy of a Louisiana-based multinational mining company called Freeport-McMoRan. Three days later, The TimesPicayune of New Orleans ran a wire-service story reporting that the cancellation was apparently linked to environmental damage at Freeport's gold mine in the remote Indonesian province of Irian Jaya. Freeport's c.e.o., James Robert (Jim Bob) Moffett, was not happy, and he and three employees marched into the offices of the paper the day the story came out, demanding a correction. They contended that OPIC's decision to cancel Freeport's $100 million insurance policy was based on potential rather than actual harm to the environment. "What they're saying," Moffett told the paper's assembled editors and its publisher, "is that a project of this size is going to be very controversial and might - might - create a controversy."

The Times-Picayune listened and quickly began investigating Moffet's claims. But after obtaining OPIC's letter of cancellation, it ran an article refuting much of what Moffett had said. Freeport, the paper reported (quoting OPIC), had "severely degraded the rain forests" in Irian Jaya.

Freeport-McMoRan, which has affiliates in both Indonesia and in Austin, Texas, has constructed a mammoth public relations team and spent a great deal of money and time trying to shape public opinion. But the media in Austin and New Orleans have turned a skeptical eye on a company they see as trying to oversell its virtue.

Freeport-McMoRan's Austin affiliate, FM Properties, develops real estate and the Indonesian affiliate, Freeport-McMoRan Copper & Gold, mines the world's largest gold reserve and runs the third-largest copper mine. Since last spring, the company has been dealing with publicity about the murder and torture of indigenous people in Irian Jaya, first nationally publicized by The Nation magazine. Some environmentalists and human rights activists in the area claim that killings perpetrated by the Indonesian military occurred on Freeport property, and may even have involved Freeport security personnel. The company vehemently denies any involvement, and said so in December in a trio of full-page ads in The New York Times.

The story of Freeport's relationship with the media in New Orleans goes back to 1984. It was then that Times-Picayune environmental reporter Mark Schleifstein discovered documents showing that the Environmental Protection Agency was planning to grant the company an exemption to the Clean Water Act allowing it to dump 25 million pounds of gypsum, a byproduct from the production of fertilizer that contains phosphate and a trace of uranium, directly into the Mississippi river. In some places along the river the gypsum had been stacked as high as forty feet.

Other stories about the gypsum contamination ran on local television news, including one five-day series in the late 1980s by Garland Robinette, then anchor and environmental reporter for WWL, the CBS affiliate in New Orleans. Freeport built a $60 million system to reduce the runoff, a process that even the company's staunchest critics concede has significantly reduced the level of phosphate in the river

It also decided to build a massive public relations machine. Its first hire? Anchorman Robinette. Then came the environmental reporter from the NBC affiliate.

In the end, Freeport had studded its large public relations team with former environmental reporters and activists.

At the same time, the company was donating large sums to local universities and charity events - from charity golf tournaments to hot meals for seniors to $600,000 for an environmental communications chair at Loyola University to train aspiring environmental journalists. And the company rarely missed an opportunity to promote itself. "Jim Bob Moffett spent more money on ads explaining why he was making the playgrounds than on the playgrounds themselves," one local reporter says. According to Robinette, the company bombarded the community with print and television advertising. "We circumvented the [media] industry," Robinette says, "and today Freeport is the most highly thought-of company in Louisiana."

In Austin, Freeport has been under scrutiny for a different reason. Since 1990, the company has been attempting to develop 4,000 acres of land into a residential and commercial area. The development lies upstream from Barton Springs, a large spring-fed swimming pool visited by some 300,000 people a year, and has encountered fierce resistance. In 1992 Austin voted nearly two to one to impose strict development standards in the areas that contribute water to Barton Springs. The company is still trying to move forward with the project.

The vote may have been influenced by relentless and critical coverage in a local alternative weekly, The Austin Chronicle. Two reporters, Daryl Slusher and Robert Bryce, wrote countless articles detailing Freeport's environmental record in both Louisiana and Indonesia. And as in New Orleans, Freeport tried to reshape its image, with heavy print and TV advertising and by hiring former environmental reporters to work on its public relations team. Its spokesman in Austin is Bill Collier, a former environmental reporter for the Austin American-Statesman. According to Collier, the company has donated as much as $42 million to charitable causes. Moffett and his wife personally donated $1 million for a new molecular biology building at the University of Texas at Austin, and Freeport matched the gift.

For years, while the Chronicle was bashing Freeport's environmental record, the American-Statesman consistently seemed to side with the company. The Statesman's publisher, Roger Kintzel, a member and onetime chairman of the Greater Austin chamber of commerce, was sympathetic to suburban development interests, according to the Chronicle's Slusher. At one point, Moffett flew top officials of Austin's chambers of commerce, including Kintzel, in his corporate jet to see his company's operations in New Orleans, a visit the Statesman dutifully covered in its people column.

As in New Orleans, however, Freeport may have placed too much faith in aggressive tactics. Last December, the company threatened to sue three University of Texas professors, two environmental activists, and two reporters (Slusher and Bryce of the Chronicle) for criticizing the company. The threat happened to follow the departure of Kintzel to The Atlanta Journal & Constitution and the arrival of a new editor, Richard Oppel, who had been Washington bureau chief for Knight-Ridder.

Oppel took the opportunity to blast the company, in a December 15 editorial marking what many consider a new era in Statesman coverage. "Corporate leaders today apparently are advised by public relations strategists and Wall Street analysts to strike back furiously, absolutely punishing critics, when drawn into controversy," he wrote. "The results are not pretty." Oppel went on to express his support for those who received the threatening letters.

Oppel again reminded the company, in a February 4 column, of his suggestion that it withdraw the threats against its critics. But by then, in both Austin and New Orleans, some of the tension between Freeport and the press had seemed to ease. Oppel also concluded that evidence directly linking the company to human rights abuse in Indonesia was thin and had been contradicted by other sources, and thus was "no longer an issue," and that "Freeport executives in Indonesia are struggling to contain the environmental damage" from the mines.

The Times-Picayune, meanwhile, weighed in with an impressive four-part series on Freeport's Indonesian operations. Reporter Stewart Yerton explained that the abuses by the Indonesian military are real - including torture and some sixteen murders, mostly in 1995 - and that although some victims blame the company for bringing soldiers to Irian Jaya, a credible human rights observer did not charge it with direct involvement in the abuse. On the environment, as a pageone Times-Picayune subhead put it, "Critics say Freeport has destroyed ancient cultures and rainforests. . . . The company says damage has been minimal. . . . Somewhere in between lies the truth." Freeport's response to the series, unlike its response to earlier reports, has so far been muted and respectful, but it's hard to tell if its fire-breathing days are over.

"The press," says Robinette,

"will communicate maybe a half-dozen times. We'll communicate with the public a couple hundred times."

## AuthorAffiliation

Dudley is a free-lance writer based in New York.

**Subject:** Newspapers; Insurance; Gold mines & mining; Environmental impact

**Location:** Indonesia

**Company:** Times-Picayune-New Orleans LA, Overseas Private Investment Corp, OPIC, Freeport-McMoRan Inc

**Publication title:** Columbia Journalism Review

**Volume:** 34

**Issue:** 6

**Pages:** 10

**Number of pages:** 4

**Publication year:** 1996

**Publication date:** Mar/Apr 1996

**Year:** 1996

**Publisher:** Columbia University, Graduate School of Journalism

**Place of publication:** New York

**Country of publication:** United States

**Publication subject:** Journalism

**ISSN:** 0010194X

**CODEN:** CJORD7

**Source type:** Scholarly Journals

**Language of publication:** English

**Document type:** Feature

**Accession number:** 02807068

**ProQuest document ID:** 230347007

**Document URL:** http://search.proquest.com/docview/230347007?accountid=13902

**Copyright:** Copyright Columbia University, Graduate School of Journalism Mar/Apr 1996

**Last updated:** 2010-06-10

**Database:** ABI/INFORM Global; ProQuest Research Library

Contact ProQuest

Copyright © 2012 ProQuest LLC. All rights reserved. - Terms and Conditions

# EXHIBIT 7

transported in Freeport buses and security vehicles (presumably with Freeport drivers) and held in Freeport security posts. When questioned directly, Paul Murphy denied any knowledge of long-term human rights abuses but, with regard to the specific incident in Tembagapura, stated that by the time Freeport personnel had heard the gunshots and investigated the source, TNI had left with their prisoners—apparently absolving the company from any responsibility.[50] But according to Munninghoff's report, there was only one gunshot in Tembagapura, and that was seven to eight hours before the detainees were removed from the town, during which time they were held and beaten in Freeport containers at the army post in Tembagapura.[51] Therefore, according to Paul Murphy's account of events, it took about seven hours for the company to investigate the gunshot in a town you could walk around in half an hour. Moreover, if gunshots were heard, it would have been obvious that the first place to investigate would be the army post.

Robert Levin, a Freeport employee, stated that company personnel were aware of incidents occurring on Christmas Day but defended his and others' inaction, arguing that people were afraid to interfere because they really didn't know what was happening and they had their wives and children with them.[52] Levin also stated that Freeport personnel had heard of the killings around the area during the year, but in a region that runs on rumor, it was hard to differentiate fact from fiction. It would appear that one Freeport employee did attempt to pass on the information about the violations during 1994 to an interested party outside the country, but, according to this source, the employee was reprimanded by the company.[53] Moreover, a man shot on the same road just a few minutes after Rumaropen reported to Freeport that he saw who shot him, and he believed it to be the military. In his opinion the company was not interested in what he had to say and took no action. Freeport needs to explain why it made no effort to protect Papuans living in and around the concession or prevent the violations. It also needs to explain why it failed to inform anyone about these violations.

Edward Pressman admitted that, in retrospect, the company handled the situation incorrectly: it should have reported the rumor of human rights violations. However, the difficulty the company faced was just who would it report such violations to when the perpetrators were themselves the law enforcers. If the same thing happened again, Pressman hoped that the company would handle the situation better to prevent further loss of lives.[54]

No one, including the company, denies that the violations occurred within the Freeport concession in December 1994, with

Freeport property being used in the torture and killing of people. Freeport has also confirmed that it was responsible for calling in the army after the shooting of Gordon Rumaropen to protect Freeport operations and employees. It would also appear that Freeport personnel were aware of human rights abuses being perpetrated by the military in its area of work during 1994. While Freeport may not have physically been involved in the killings and torture, it cannot expect to operate in West Papua, mine the traditional land of the indigenous peoples, have a contract of work that effectively creates a close working relationship with TNI, rely on TNI to protect its facilities, and have human rights violations perpetrated in its area of work by the group it specifically called in to protect it without accepting some of the responsibility. It cannot, and does not, operate in isolation. While Freeport cannot always control the actions of the military the fact remains that, for as long as the company maintains a close relationship with TNI, it may be argued that it is implicitly involved in all that the military does in protection of its mine, including human rights violations. Moreover, with the U.S. courts recently recognizing the legal ramifications of such associations, the company now has a legal responsibility.

In response to the negative publicity of 1995, TNI announced that it was adopting a humane face: it issued its troops a booklet detailing a human rights code of conduct and, ominously, announced that it was increasing its presence in the region. While the government and the military were making "positive" public utterances, the reality in West Papua bore scant resemblance to the rhetoric. With outside interest abating, the promised bureaucrats failed to arrive, and the military expanded its operations. Using the OPM hostage taking that followed a few months later as justification, Jakarta sealed off the highland region; by April 1996, with the reported arrival of three thousand to four thousand new troops and the stationing of an Indonesian warship at the port of Amamapere, the military presence around the mine had increased dramatically. TNI once again launched a campaign of terror against the indigenous peoples of West Papua who lived near the mine. By December 1997 the military announced that the Freeport concession area was to become the most militarized subdistrict in Indonesia, claiming that the economic importance of the area and the associated need to "safeguard security and deal with any unrest" justified such a move.[55]

On 26 May 1998 the local churches released a report that claimed that between December 1996 and October 1997, rather than an easing of tensions as the government had promised, there had been an army crackdown led by forces under the command of Lieutenant General



Prabowo Subianto. The report detailed the military's terrorizing of groups of villagers, the extrajudicial killing and disappearance of some thirteen people, the subsequent deaths of many others from disease and malnutrition caused by their fleeing into the jungle to escape persecution, and the destruction of whole villages, churches, homes, livestock, and gardens. As a result at least another 137 people had died. Years later many of the people who fled still choose a difficult nomadic existence in the interior of the island to avoid further contact with the Indonesian military. The church report claimed that these violations were carried out by the military in retaliation for the kidnapping but also in an attempt to destroy the OPM and "to secure the 'vital project' of PT Freeport Indonesia Inc."[96] This time the world paid scant attention, for the events in Jakarta just six days before eclipsed the news from West Papua.

## TRANSMIGRATION

While the relationship between Freeport security and TNI implicated the company in human rights abuses, so too does the policy of forced population displacement or transference within the company's concession area, either in the form of *transmigrasi* (transmigration) or *relokasi* (relocation), both of which have led to the loss of traditional lands and culture. The indigenous peoples claim that, without the company's presence, population displacement by either of these methods would simply not have happened. One of the essential elements in the "Indonesianization" of West Papua leading to the violation of human rights in the province has been the transmigration program.

Transmigration was first introduced by the Dutch in 1905 when they moved impoverished Javanese peasants to the less-populated areas to supposedly allow them to start a new life. In reality they represented a supply of cheap labor to foreign-owned plantations. The Suharto regime's transmigration policy, which systematically moved large numbers of migrants from the more crowded islands such as Java and Sulawesi to the outer resource-rich provinces, was not dissimilar. Throughout the history of the New Order government, transmigration was promoted internationally as a socioeconomic program aimed at relieving the population pressure on the densely populated main islands and received extensive financial support from its main donors, the World Bank and the IGGI/CGI.[57] Yet Jakarta's argument that transmigration was essential to relieve population pressure ... than a million and a half

families from 1969 to 1994 out of a total population of over two hundred million did little to ease overcrowding.[58]

In practice the Indonesian program was an integral part of the central government's policy of "Indonesianization"[59] or the creation of one kind of Indonesian[59] and focused on incorporating areas resistant to Jakarta's rule, such as East Timor, Aceh, and West Papua. At the same time, transmigration has focused on ensuring a supply of cheap and readily accessible labor to foreign enterprises operating in the most remote regions of the archipelago. Thus, transmigration had a political purpose (the control of the indigenous minorities), a cultural purpose (the alienation and destruction of traditional cultures), and an economic purpose (support for FDI). Given the above, the importance of transmigration to the Suharto government could not be overstated: the 1995 fiscal budget allocated $93 million to the program, making it second in terms of funding only to public works.

### Transmigration in West Papua

To secure Indonesian control over West Papua by weakening local resistance and strengthening its border defenses, Jakarta focused on populating strategic regions in the province with transmigrants loyal to the center. Toward this end it encouraged the movement of voluntary transmigrants and financially supported the official government programs of sponsored transmigration (carried out by the government) and assisted-spontaneous transmigration (support by both the government and business). Although Jakarta always denied that the program had a political and security agenda, this association is clearly evident in West Papua in the siting of the settlements. Most are situated along the border with Papua New Guinea to create a cordon sanitaire in a region that always posed a dual security dilemma for the central government. Not only is it an indefensible border shared with an unstable and weak government whose people profess close historical and cultural ties with the inhabitants of West Papua, but the area affords shelter and protection to the OPM. Moreover, much to the embarrassment of Jakarta, OPM and Melanesian asylum seekers routinely cross the border into Papua New Guinea for sanctuary from the Indonesian military. While positioning is an indicator of the settlements' political character, so too is the fact that in the more unstable regions a good percentage of the transmigrants are reputed to be former army personnel.

Through the policy of *relokasi* the Papuan landowners have forcibly been moved by the military to designated transmigration settlements where the

# EXHIBIT 8

STANLEY FLEISHMAN (1920-1999)
BARRY FISHER*
DAVID GROSZΔ
MICHAEL B. WEISZΔ
HENRY W. McGEE, JR. Δ
WILLIAM M. KRAMER (1920-2004)

# FLEISHMAN & FISHER
### LAWYERS
1925 CENTURY PARK EAST, SUITE 2000
LOS ANGELES, CALIFORNIA 90067
(310) 557-1077 TELECOPIER (310) 557-0770

*PROFESSIONAL CORPORATIONS
ΔOF COUNSEL
CABLE ADDRESS: ARJUNA
EMAIL: BFSHR557@GMAIL.COM

June 5, 2020

Christopher Wray, Director
Federal Bureau of Investigation
935 Pennsylvania Avenue, N.W.
Washington, D.C. 20535-0001

Re: <u>John █ Wilson</u>

Dear Director Wray:

This firm represents John C. Wilson regarding the conduct of persons causing him harm he has reason to believe were operating on behalf of the FBI. or other element of the United States Department of Justice(DOJ). A history of correspondence over some 3 years resulted solely in a disclaimer that the persons involved were neither F.B.I. special agents nor employees but neither addressed nor denied to date is whether they operated on behalf of the FBI or other DOJ element. The most recent non-response is the 21 March 2020 DOJ - FOIA request denial.

The details at issue are set out in letters I wrote to the US Attorney General, Inspector General of the DOJ, and Director of the FBI June 24, 2016 attaching Mr. Wilson's 23 February 2016 letter, in follow up has not been answered except to tell him that the F.B.I. is the agency of the DOJ he should be addressing. The FBI has not responded.

The crux of Mr. Wilson's complaint is that false intelligence has been disseminated against him by the FBI in the U.S. to partnering agencies in the U.S. and overseas. This follows a work report he published as a Wall Street mining analyst working for SG Warburg (precursor to UBS Warburg) on US mining company Freeport McMoran March 12, 1996 that at the time was under investigation by the State Department following credible and widely reported allegations it was involved in the killing of indigenous protestors at its Grasberg mine in West Papua, Indonesia. He has been denied official acknowledgement of, or access to, any of the FBI's assertions, let alone test any of their claims in court, due to excessive secrecy around what they do. As such, he has endured a deprivation of basic human rights over a period now spanning more than 20 years.

Since then, Mr Wilson has been subjected to a systematic retaliation campaign by persons associated with the FBI involving invasive and aggressive tactics that include targeting his employment, professional, and social networks.

Susan Holmes engendered a personal relationship with Mr. Wilson for 3 years in NYC from 1994 to 1997 during which time she showed him what purported to be her FBI card and made multiple personal disclosures about her work to him. After Mr Wilson's Freeport work note was published 12 March 1996, the FBI commenced interference and disruption tactics across all aspects of his life - professional, social and family networks, surveillance and other intrusions into his life.  Descriptions of the FBI intrusions are in the enclosed  document "John Wilson Abridged Notes June 2020". This includes details of Susan Holmes' work purporting to be on behalf of  the FBI; an overview of a long covert FBI dinner interview in NYC 2003 in which many personal details and personal records spanning many decades and diverse locations from Mr. Wilson's life were revealed (Mr Wilson's transcript of this interview is available upon request); assertions of false intelligence arise from comments made by the FBI and concern the apparent association of Mr Wilson though agent Susan Holmes' work for the FBI with David Foreman, a high profile eco-activist.

In the years following the 1996 publication regarding the Freeport McMoran killings, he had many other contacts with people who at some point revealed themselves as FBI agents and who let him know that he angered important people by the publication. Some of these individuals engendered friendship with him under the auspices of other professional identities and each has interviewed him, two of them extensively, in addition to Susan Holmes' extensive NYC covert interview in 2003.  These include- Steven Garber, formerly of  New York City, and Livingston Sutro, formerly of Sierra Vista, Arizona.

Aside from these apparent DOJ agents, more than a dozen other people have identified themselves to him as having a high level of familiarity with these circumstances and appear to be FBI agents or associated with agents. A partial list of names of agents has been provided to the FBI and DOJ in the past (the February 23, 2016 letter with list is attached).

The serious allegations of FBI misconduct in this matter have never been investigated, nor has there ever been a response concerning the correct roles of the agents named.

I write to request this matter be thoroughly investigated and hope that this long standing request can now be addressed definitively.

Sincerely yours,


Barry A. Fisher

Christopher Wray, Director
Federal Bureau of Investigation,
935 Pennsylvania Avenue, N.W.
Washington, D.C. 20535-0001


Congressman Jerrold Nadler
2132 Rayburn HOB
Washington, D.C. 20535


White House
600 Pennsylvania Avenue
Washington, D.C.  20530


Michael Evan Horowitz
Inspector General
Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001


Senator Charles Schumer
Leo O'Brien Building
Room 420
Albay, NY 12207


William P. Barr
Attorney General
Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001